IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 16-1285

UNITED STATES OF AMERICA, APPELLEE

V.

RICHARD J. HARLEY, APPELLANT

APPENDIX OF APPELLANT, RICHARD J. HARLEY,
VOLUME ONE (1A –86A)

ON APPEAL FROM JUDGMENT OF SENTENCE
ENTERED BY THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA ON
NOVEMBER 16, 2015 (M.D. PA. NO. 3:CR-12-00224)

Bruce Brandler, Esquire
*Attorney for Appellee, USA*
U.S. Attorneys Office
Wm. J. Nealon U.S. Courthouse
235 North Washington Avenue
PO Box 309
Scranton, PA 18501-0309


DATE:   September 23, 2016

Joseph A. O'Brien, Esquire
*CJA Attorney for Appellant,*
*Richard J. Harley*
Oliver, Price & Rhodes
1212 South Abington Road
P.O. Box 240
Clarks Summit, PA 18411
Tel No. 570-585-1200
Fax No. 570-585-5100
Email: jaob@oprlaw.com

# TABLE OF CONTENTS

**VOLUME ONE**

INDICTMENT ................................................................................................ 1A

MEMORANDUM AND ORDER DENYING MOTION TO SUPPRESS................23A

MOTION FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL ......................... 28A

JUDGMENT OF CONVICTION......................................................................... 32A

MEMORANDUM AND ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL
AND NEW TRIAL .......................................................................................40A

NOTICE OF APPEAL.......................................................................................60A

DISTRICT COURT DOCKET SHEET...............................................................63A

**VOLUME TWO**

TRIAL TRANSCRIPT – WEDNESDAY, DECEMBER 3, 2014........................... 101A

TRIAL TRANSCRIPT – THURSDAY, DECEMBER 4, 2014............................... 181A

**VOLUME THREE**

TRIAL TRANSCRIPT – THURSDAY, DECEMBER 4, 2014............................... 269A

TRIAL TRANSCRIPT – FRIDAY, DECEMBER 5, 2014 .................................... 383A

**VOLUME FOUR**

TRIAL TRANSCRIPT – FRIDAY, DECEMBER 5, 2014 .................................... 437A

TRIAL TRANSCRIPT – MONDAY, DECEMBER 8, 2014.................................. 591A

**VOLUME FIVE**

TRIAL TRANSCRIPT – MONDAY, DECEMBER 8, 2014................................... 605A

**VOLUME SIX**

TRIAL TRANSCRIPT – MONDAY, DECEMBER 8, 2014................................. 773A

TRIAL TRANSCRIPT – TUESDAY, DECEMBER 9, 2014 ................................ 813A

**VOLUME SEVEN**

TRIAL TRANSCRIPT – TUESDAY, DECEMBER 9, 2014 ................................ 941A

TRIAL TRANSCRIPT – WEDNESDAY, DECEMBER 10, 2014......................... 994A

TRIAL TRANSCRIPT – THURSDAY, DECEMBER 11, 2014........................... 1096A

**VOLUME EIGHT**

TRIAL TRANSCRIPT – THURSDAY, DECEMBER 11, 2014........................... 1108A

TRIAL TRANSCRIPT – FRIDAY, DECEMBER 12, 2014 ............................... 1232A

**VOLUME NINE**

TRIAL TRANSCRIPT – FRIDAY, DECEMBER 12, 2014 ............................... 1275A

TRIAL TRANSCRIPT – MONDAY, DECEMBER 15, 2014............................. 1376A

**VOLUME TEN**

TRIAL TRANSCRIPT – MONDAY, DECEMBER 15, 2014............................. 1442A

TRANSCRIPT OF SENTENCING HEARING – THURSDAY, NOVEMBER 12, 2015 .....
..................................................................................................1534A

TRANSCRIPT OF SUPPRESSION HEARING – TUESDAY, APRIL 8, 2014........ 1565A

**VOLUME ELEVEN**

GOVERNMENT EXHIBITS 1.1 THROUGH 15.2 ............................................. 1609A

**VOLUME TWELVE**

GOVERNMENT EXHIBITS 15.3 THROUGH 16.1 .......................................... 1687A

**VOLUME THIRTEEN**

GOVERNMENT EXHIBITS 16.2 THROUGH 20.6(H) .................................... 1873A

**VOLUME FOURTEEN**

GOVERNMENT EXHIBITS 20.7 THROUGH 23.5(B) .................................... 2036A

**VOLUME FIFTEEN**

GOVERNMENT EXHIBITS 23.6 THROUGH 27.33 ........................................ 2201A

**VOLUME SIXTEEN**

GOVERNMENT EXHIBITS 27.3 THROUGH 36.12 ........................................ 2367A

**VOLUME SEVENTEEN**

GOVERNMENT EXHIBITS 36.13 THROUGH 36.22 .................................... 2533A

**VOLUME EIGHTEEN**

GOVERNMENT EXHIBITS 36.23 THROUGH 43.2 ........................................ 2695A

**VOLUME NINETEEN**

GOVERNMENT EXHIBITS 43.3 THROUGH 9.1 ........................................... 2858A

PJS:BB:nl

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      )    CRIMINAL NO. *3:12CR224*

           v.                 )

RICHARD J. HARLEY,             )

                Defendant.    )

*FILED*
*Harrisburg*
AUG 30 2012

PER_____
DEPUTY CLERK

**I N D I C T M E N T**

**COUNTS ONE THROUGH FIFTEEN**
(WIRE FRAUD)

THE GRAND JURY CHARGES:

**I.   THE DEFENDANT**

    1.   The defendant, Richard J. Harley ("Harley"), represented himself as the Chief Executive Officer of RJH and Company, Inc. ("RJH").  Harley claimed that RJH was a "vertically integrated privately held holding company owning, controlling, leasing, developing, and administering assets in commercial and residential real estate, petroleum products, and commodities." RJH is a New Jersey Corporation which was incorporated by Harley in 1989.

    2.   Harley claimed that the principal asset of RJH was approximately ten million barrels of oil located in Brown County,

1A

Texas, which were "wholly owned by RJH" worth "in excess of $1 billion."

3. Harley also claimed that RJH owned "investment grade debt instruments valued in excess of $1 billion," that RJH had "unrestricted bond power over Federal Reserve Bank instruments" worth "more than $700 billion," and that he had authority to negotiate two U.S. Treasury $500 million checks issued by the Federal Reserve Bank of New York.

4. Harley also claimed that he personally owned valuable oil paintings worth in excess of $1 million.

## II.   THE SCHEMES TO DEFRAUD

### A.   The Oil Scheme.

5. Starting sometime in 1999, the exact date being unknown to the grand jury, Harley executed and attempted to execute a scheme and artifice to defraud individuals and/or financial and other lending institutions of money and property by soliciting and obtaining money under false pretenses, representations, and promises in connection with oil supposedly owned by RJH in Brown County, Texas.

6. In order to induce individuals and/or financial and lending institutions to loan RJH money, Harley falsely claimed

-2-

that RJH owned approximately ten million barrels of oil in Texas

worth in excess of $1 billion.  Harley further represented that

he needed money to extract the oil from the ground and would pay

investors up to ten times their investment from the proceeds of

the sale of the oil once it was recovered.  In reality, neither

RJH nor Harley owned any oil reserves in Texas and neither Harley

nor RJH ever intended to repay the victims on their "loans."

Once Harley received the money, he simply used it for personal

expenses, unrelated to the oil he claimed RJH owned in Texas.

7.  To support RJH's false claims of ownership, Harley

provided individuals via email over the internet and by other

methods with various fraudulent paperwork, including, but not

limited to a "certified copy" of a promissory oil production note

in the amount of $200 million payable to RJH from Enpetro LPC,

Inc., a defunct oil company based in Texas; an assignment of

collateral between Enpetro LPC and RJH concerning ten million

barrels of oil reserves in Brown County, Texas; and an oil

reserve analysis authored by a petroleum geologist Harley hired

indicating that certain oil reserves purportedly backing the note

was worth in excess of $1 billion.  As Harley well knew, the oil

production note and assignment of collateral were worthless, RJH

did not own any oil reserves in Texas, and RJH had no right to

-3-

3A

extract any oil from the ground and sell it as promised to investors.

8.  It was further part of the scheme to defraud that Harley induced the victims to lend RJH money by providing the victims with a series of fraudulent documents, including, but not limited to, "secured corporate promissory notes" in the name of RJH and "joint venture agreements" between RJH and/or Harley and the victim in which Harley solicited the victim to loan RJH money and participate in a "private placement program" based upon the purported value of the Enpetro LPC note which promised to pay the victim up to ten times the amount of money loaned to Harley and/or RJH within a short period of time.  Harley also promised to transfer an ownership interest in artwork he claimed was worth more than $1 million to one victim to ensure repayment on the RJH notes, and promised to make a $500,000 donation, as well as a $1.5 million loan to a Temple one victim was associated with from the profits RJH was supposedly going to generate.

9.  It was further part of the scheme that once the RJH notes to the victim were due, Harley would refuse to pay, make more promises and guarantees which he never intended to fulfill, and issue more "secured promissory notes" promising to pay more and more money to the victim at a later point in time.

-4-

4A

10.  It was further part of the scheme that Harley attempted to conceal the fact that he had stolen the victim's money and attempted to avoid paying the victim any money by filing petitions in the United States Bankruptcy Court seeking to have his and RJH's debts to the victim discharged.

11.  It was further part of the scheme that in 1999, Harley attempted to defraud South Trust Bank in Tuscaloosa, Alabama, into providing him a "safekeeping receipt" for the $200 million oil production promissory note in connection with a fraudulent attempt by Harley to obtain money from investors using the promissory note as security for their investments.

12.  It was further part of the scheme that between September 2006 and June 2009, Harley obtained approximately $267,500 from three different victims of the oil scheme who wired money into a Merrill Lynch Pierce Fenner & Smith brokerage account controlled by Harley, or otherwise provided him with checks or cash in connection with the oil scheme.  In addition to the false representations referenced above, Harley never disclosed to any of his victims that he had unpaid debts to the SEC and the United States in excess of $1 million, in connection with a prior fraudulent investment scheme where he was convicted in federal court for defrauding patients and investors by

5A

promoting an unsafe and untested "ozone/oxygen enema therapy" for AIDS/HIV patients.

**B.   The Treasury Check Scheme.**

13.   Harley falsely claimed that RJH owned valuable bank instruments totaling more than $700 billion and solicited financial and other lending institutions to negotiate and deposit those funds, manage those funds, and lend RJH money against those funds.  Harley also falsely claimed that he had authority to negotiate those funds on behalf of RJH and the payees listed on the bank instruments.  Harley generally communicated with the financial and other lending institutions via telephone calls and/ or emails over the internet.

14.   For example, in April 2009, Harley attempted to deposit two $500 million U.S. Treasury checks purportedly issued by the Federal Reserve Bank of New York and payable to "Joseph Teo Hui Kiat" into an investment account he maintained along with RJH at Merrill Lynch, Pierce Fenner and Smith ("MLPF&S") in Wayne, Pennsylvania.  MLPF&S refused to deposit the checks, informed Harley the checks were fraudulent, and closed his account.

15.   In April 2009, Harley again attempted to deposit the two $500 million checks purportedly issued by the Federal Reserve

-6-

6A

Bank of New York into a brokerage account he attempted to set up at LPL Financial, a securities broker/dealer located in San Diego, California.  LPL Financial also refused to open an account for Harley and refused to deposit the checks.

16.  In March and April 2011, Harley contacted officials at the Federal Reserve Bank of Atlanta and the Federal Reserve Bank of New York and provided those officials with copies of the two $500 million checks and associated paperwork and demanded payment on the checks.  Harley was informed that the checks were fraudulent and part of a well-known scheme to defraud the Federal Reserve Bank.

17.  In March 2012, Harley again attempted to deposit the two fraudulent $500 million checks into an account he attempted to set up at State Street Alternative Investment Solutions ("State Street") located in Boston, Massachusetts.  Harley stated to State Street that he wanted to deposit the checks and have State Street lend him money against the checks and manage $500 billion in assets he controlled.  Harley provided State Street various fraudulent documentation in order to induce State Street to accept the checks and lend him money.  State Street refused to open the account and refused to lend Harley any money.

-7-

## C.   The Bankruptcy Fraud Scheme.

18.   In an effort to defraud Harley's and RJH's creditors, to conceal his and RJH's assets and liabilities, and to execute the oil scheme against Victim #1, Harley engaged in a continuing course of fraudulent conduct which included the filing of three bankruptcy petitions in the U.S. Bankruptcy Court for the Middle District of Pennsylvania.

19.   On or about November 9, 2009, an individual, referred to in this Indictment as Victim #1, filed a lawsuit against RJH, Harley, and Harley's wife in the Court of Common Pleas of Lehigh County, Pennsylvania, wherein Victim #1 alleged that RJH, Harley, and Harley's wife defrauded him in connection with $239,500 he gave to Harley in the oil scheme. According to the lawsuit, Harley and RJH promised to pay Victim #1 over $1 million pursuant to various "secured corporate promissory notes" and "joint venture agreements," but failed to do so. On August 8, 2011, judgment was entered in favor of Victim #1 against RJH, Harley, and Harley's wife, in the amount of $1,140,000 as of July 2, 2009, plus interest thereon after that date at the rate of six percent per year.

20.   For the purpose of concealing the fact that RJH never intended to pay the promised return and that Victim #1's money

8A

had been stolen and diverted to Harley's personal use, Harley
filed two petitions on behalf of RJH in the United States
Bankruptcy Court for the Middle District of Pennsylvania, which
were filed under Title 11 of the Bankruptcy Code, wherein Harley
attempted to discharge the debts owed to Victim #1, to wit:  In
Re: RJH and Company, Inc., 5:10-BK-09451-RNO ("the 2010
petition"); and In Re: RJH and Company, Inc., 5:11-BK-02060-JJT
("the 2011 petition").

21.  In both the 2010 and 2011 petitions, Harley listed
Victim #1 as a creditor in the amount of $2 million.  Harley
also falsely represented that RJH had assets totaling $765
million, including approximately 10 million barrels of proven oil
reserves valued at $700 million.

22.  On or about May 29, 2012, Harley filed a personal
bankruptcy petition in the United States Bankruptcy Court for the
Middle District of Pennsylvania, which was filed under Title 11
of the Bankruptcy Code, wherein Harley attempted to discharge a
debt owed to the Northslope III Owners' Association in the amount
of $37,793.61.  Harley made numerous false statements in his
petition, including (1) failing to list any position in RJH; (2)
failing to list Victim #1 as a creditor, despite Victim #1 having
obtained an unpaid judgment against Harley on August 8, 2011, for

-9-

over $1 million; (3) failing to list any art work, including an
oil painting attributed to J. Lee Settlemeyer known as
"Liberation, The Lady," which Harley claimed to Victim #1 was
worth approximately $1.8 million and an oil painting by Titian
which Harley also claimed to own; (4) failing to list the SEC as
a creditor, despite the SEC having obtained an unpaid judgment
against Harley on January 4, 2008, for over $1 million; and
(5) failing to list the United States as a creditor, despite the
United States having obtained an unpaid restitution judgment in
the amount of $168,152 and a special assessment judgment of $650
against Harley on March 30, 2001.

### III.   STATUTORY ALLEGATIONS

23.   From on or about 1999 until the date of this
Indictment, in the Middle District of Pennsylvania and elsewhere,
the defendant,

### RICHARD J. HARLEY,

knowingly and willfully devised and intended to devise a scheme
and artifice to defraud, and to obtain money and property by
means of materially false and fraudulent pretenses,
representations, and promises and for the purpose of executing
the scheme and artifice to defraud and to obtain money and

10A

property and attempting to do so, did on or about the dates
specified below, transmit and cause to be transmitted by means of
wire and radio communication in interstate and foreign commerce,
certain writings, signs, signals, pictures, and sounds, as more
particularly described in each count below:

| Count | Date | Nature of Wire Transmission | Sender | Recipient |
|-------|------|-----------------------------|--------|-----------|
| 1 | 07/24/08 | Wire transfer $35,000 | Embassy Bank, Bethlehem, PA, account of Victim #1 | MLPF&S, Wayne, PA, account of RJH and Co. |
| 2 | 09/04/08 | Wire transfer $15,000 | Embassy Bank, Bethlehem, PA, account of Victim #1 | MLPF&S, Wayne, PA, account of RJH and Co. |
| 3 | 02/13/09 | Wire transfer $10,000 | Embassy Bank, Bethlehem, PA, account of Victim #1 | MLPF&S, Wayne, PA, account of RJH and Co. |
| 4 | 02/17/09 | Wire transfer $10,000 | Embassy Bank, Bethlehem, PA, account of Victim #1 | MLPF&S, Wayne, PA, account of RJH and Co. |
| 5 | 03/24/09 | Wire transfer $3,500 | Embassy Bank, Bethlehem, PA, account of Victim #1 | MLPF&S, Wayne, PA, account of RJH and Co. |

11A

| Count | Date | Nature of Wire Transmission | Sender | Recipient |
|-------|------|------------------------------|--------|-----------|
| 6 | 12/20/07 | Wire transfer $10,000 | Hughes Aircraft Emp. FCU, CA, account of Victim #2 | MLPF&S, Wayne, PA, account of RJH and Co. |
| 7 | 12/16/08 | Wire transfer $3,000 | Citibank, N.A., NY, NY, account of Victim #3 | MLPF&S, Wayne, PA, account of RJH and Co. |
| 8 | 12/22/08 | Wire transfer $5,000 | Citibank, N.A., NY, NY, account of Victim #3 | MLPF&S, Wayne, PA, account of RJH and Co. |
| 9 | 05/16/09 | Email containing images of two Federal Reserve checks and supporting documentation | rjhco@verizon.net | Victim#3@cassell e.com |
| 10 | 04/28/09 | Email containing Financial Guarantee Agreement from Prudential Life Assurance | rjhco@verizon.net | Victim#3@cassell e.com |
| 11 | 05/04/10 | Email containing RJH and Co. corporate profile | rjhco@verizon.net | Victim#4@gmail.c om |

-12-

| Count | Date | Nature of Wire Transmission | Sender | Recipient |
|-------|------|-----------------------------|--------|-----------|
| 12 | 04/20/09 | Email containing images of two Federal Reserve checks and supporting documentation | rjhco@verizon.net | Victim#5@ml.com |
| 13 | 04/03/12 | Email containing RJH and Co. corporate profile and supporting documentation | mprllc1@yahoo.com | Victim#6@statestreet.com |
| 14 | 04/28/09 | Email containing images of two Federal Reserve checks and supporting documentation | rjhco@verizon.net | Victim#7@1pl.com |
| 15 | 04/18/11 | Four emails containing images of two Federal Reserve checks, supporting documentation, and cash payment demand for $1 billion | r.harley@rjhco3.com | Victim#8@ny.frb.org |

Each count in violation of Title 18, United States Code, Section 1343.

### COUNT SIXTEEN

### (BANKRUPTCY FRAUD)

**THE GRAND JURY FURTHER CHARGES:**

24.  The allegations contained in paragraphs 1 through 22 of this Indictment are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

25.  On or about November 22, 2010, in the Middle District of Pennsylvania, the defendant,

**RICHARD J. HARLEY,**

with the intent to devise a scheme and artifice to defraud Victim #1, and for the purpose of executing and concealing said scheme and artifice, filed a petition under Title 11, United States Code, which was titled, In Re: RJH and Company, Inc., 5:10-BK-09451-RNO.

In violation of Title 18, United States Code, Section 157(1).

14A

## COUNT SEVENTEEN

### (BANKRUPTCY FRAUD)

**THE GRAND JURY FURTHER CHARGES:**

26. The allegations contained in paragraphs 1 through 22 of this Indictment are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

27. On or about March 24, 2011, in the Middle District of Pennsylvania, the defendant,

### RICHARD J. HARLEY,

with the intent to devise a scheme and artifice to defraud Victim #1, and for the purpose of executing and concealing said scheme and artifice, filed a petition under Title 11, United States Code, which was titled, <u>In Re: RJH and Company, Inc.</u>, 5:11-bk-02060-JJT.

In violation of Title 18, United States Code, Section 157(1).

## COUNT EIGHTEEN

### (FALSE STATEMENTS)

**THE GRAND JURY FURTHER CHARGES:**

28. The allegations contained in paragraphs 1 through 22 of this Indictment are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

29.   On or about November 22, 2010, in the Middle District of Pennsylvania, the defendant,

**RICHARD J. HARLEY,**

knowingly and fraudulently made a material false declaration, certificate, verification, and statement under penalty of perjury, as permitted under Section 1746 of Title 28, in or in relation to a case under Title 11, to wit:   <u>In Re: RJH and Company, Inc.</u>, 5:10-BK-09451-RNO, by (1) submitting a schedule of assets of RJH and Company, Inc., stating RJH had assets totaling $765 million, including approximately 10 million barrels of proven reserves valued at $700 million, when in truth and in fact, as Harley well knew, such statements were false.

In violation of Title 18, United States Code, Section 152(3).

### COUNT NINETEEN

#### (FALSE STATEMENTS)

**THE GRAND JURY FURTHER CHARGES:**

30.   The allegations contained in paragraphs 1 through 22 of this Indictment are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

31.   On or about March 24, 2011, in the Middle District of Pennsylvania, the defendant,

**RICHARD J. HARLEY,**

knowingly and fraudulently made a material false declaration, certificate, verification, and statement under penalty of perjury, as permitted under Section 1746 of Title 28, in or in relation to a case under Title 11, to wit: <u>In Re: RJH and Company, Inc.</u>, 5:11-BK-02060-JJT, by (1) submitting a schedule of assets of RJH and Company, Inc., stating RJH had assets totaling $765 million, including approximately 10 million barrels of proven reserves valued at $700 million, when in truth and in fact, as Harley well knew, such statements were false.

In violation of Title 18, United States Code, Section 152(3).

## COUNT TWENTY

### (FALSE STATEMENTS)

**THE GRAND JURY FURTHER CHARGES:**

32.   The allegations contained in paragraphs 1 through 22 of this Indictment are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

33.   On or about May 29, 2012, in the Middle District of Pennsylvania, the defendant,

**RICHARD J. HARLEY,**

-17-

knowingly and fraudulently made a material false declaration, certificate, verification, and statement under penalty of perjury, as permitted under Section 1746 of Title 28, in or in relation to a case under Title 11, to wit: <u>In Re: Richard Harley</u>, 5:12-bk-03201-RNO, by submitting a list of creditors which omitted Victim #1, the SEC, and the United States when, in truth and in fact, as Harley well knew, Victim #1, the SEC, and the United States were creditors.

In violation of Title 18, United States Code, Section 152(3).

### COUNT TWENTY-ONE

### (FALSE STATEMENTS)

**THE GRAND JURY FURTHER CHARGES:**

34.   The allegations contained in paragraphs 1 through 22 of this Indictment are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

35.   On or about May 29, 2012, in the Middle District of Pennsylvania, the defendant,

### RICHARD J. HARLEY,

knowingly and fraudulently made a material false declaration, certificate, verification, and statement under penalty of perjury, as permitted under Section 1746 of Title 28, in or in

-18-

relation to a case under Title 11, to wit: <u>In Re: Richard</u>
<u>Harley</u>, 5:12-bk-03201-RNO, by submitting a statement of financial
affairs which falsely stated that Harley had no businesses in
which he was an officer, director, partner, or managing executive
of a corporation, partner in a partnership, sole proprietor, or
was self-employed in a trade, profession, or other activity,
either full or part-time, within six years immediately preceding
the commencement of the bankruptcy filing, when, in truth and in
fact, as Harley well knew, he was the Chief Executive Officer of
RJH during that time period.

In violation of Title 18, United States Code, Section
152(3).

<u>COUNT TWENTY-TWO</u>

(FALSE STATEMENTS)

THE GRAND JURY FURTHER CHARGES:

36.   The allegations contained in paragraphs 1 through 22 of
this Indictment are hereby repeated, realleged, and incorporated
by reference as if fully set forth herein.

37.   On or about May 29, 2012, in the Middle District of
Pennsylvania, the defendant,

RICHARD J. HARLEY,

-19-

knowingly and fraudulently made a material false declaration,

certificate, verification, and statement under penalty of

perjury, as permitted under Section 1746 of Title 28, in or in

relation to a case under Title 11, to wit: <u>In Re: Richard

Harley</u>, 5:12-bk-03201-RNO, by failing to list all personal

property owned by him and his wife, including art objects.

In violation of Title 18, United States Code, Section
152(3).

### <u>COUNT TWENTY-THREE</u>

### (BANK FRAUD)

**THE GRAND JURY FURTHER CHARGES:**

38. The allegations contained in paragraphs 1 through 22 of

this Indictment are hereby repeated, realleged, and incorporated

by reference as if fully set forth herein.

39. From on or about April 2009, to on or about April 2012,

in the Middle District of Pennsylvania and elsewhere, the

defendant,

### RICHARD J. HARLEY,

knowingly and willfully devised a scheme and artifice to defraud

the Federal Reserve Bank of New York, a financial institution

under Title 18, United States Code, Section 20, and to obtain the

moneys, funds, credits, assets, securities, or other property

-20-

owned by or under the custody or control of the Federal Reserve Bank of New York by means of materially false and fraudulent pretenses, representations, and promises.

40. Harley knowingly executed and attempted to execute the above-referenced scheme and artifice to defraud in various ways, including, but not limited to the following:

41. It was part of the scheme and artifice to defraud that Harley falsely claimed to be the lawful holder of two U.S. Treasury $500 million checks issued by the Federal Reserve Bank of New York and payable to Joseph Teo Hui Kiat, and that Harley was authorized to negotiate those checks.

42. It was further part of the scheme and artifice to defraud that Harley would provide various lending and financial institutions with copies of the two fraudulent checks, as well as other fraudulent documentation, supposedly generated by the Federal Reserve Bank of New York and others so as to make it appear that the checks were legitimate and that he had authority to negotiate the checks.

43. It was further part of the scheme and artifice to defraud that Harley attempted to negotiate and deposit the checks and use the funds as collateral for loans from lending and financial institutions.

-21-

44.  It was further part of the scheme and artifice to
defraud that Harley demanded a $1 billion cash payment from the
Federal Reserve Bank in March and April 2011, pursuant to the two
fraudulent U.S. Treasury $500 million supposedly issued by the
Federal Reserve Bank of New York.

In violation of Title 18, United States Code, Section 1344.

A TRUE BILL

_Peter Smith_
**PETER J. SMITH**
**U.S. ATTORNEY**

_Aug 30, 2012_
**DATE**

-22-

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA

v.

RICHARD J. HARLEY,

     Defendant.

3:12-CR-224

(JUDGE CAPUTO)

<u>**ORDER**</u>

**NOW**, this 10th day of April, 2014, **IT IS HEREBY ORDERED** that Defendant Harley's Motions to Suppress Physical Evidence (Doc. 40) is **DENIED**.

               /s/ A. Richard Caputo
               A. Richard Caputo
               United States District Judge

23A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,                          3:12-CR-224

                    v.

                                                   (JUDGE CAPUTO)
RICHARD J. HARLEY,

          Defendant.

## MEMORANDUM

Presently before the Court is Defendant Richard J. Harley's Motion to Suppress Physical Evidence (Doc. 40).  The Court held a Suppression Hearing on Mr. Harley's motion on April 8, 2014.  Because the search warrant issued in this case, Mr. Harley's motion will be denied.

## BACKGROUND

Defendant Richard J. Harley's residence was searched on August 29, 2012 by law enforcement officers and a number of items were seized.  Mr. Harley now moves to suppress the fruits of the search conducted at his residence, including the statements obtained from him as a result of the agents' allegedly unlawful presence on the premises.

At the Suppression Hearing, FBI Special Agent Vince Browning testified that he obtained a warrant to search Mr. Harley's residence from a Magistrate Judge, which he executed on August 29, 2012.  *See* Gvt. Ex. 1.[1]  Upon entering the premises, Browning testified that he identified himself as an FBI agent and stated that he had a warrant. Browning also stated that he interviewed Mr. Harley for approximately forty-five (45)

---

[1]      Reference to exhibits and corresponding numbers correlate to those as submitted during the Suppression Hearing held on April 8, 2014.

minutes to one (1) hour.  Browning testified that over the course of the interview, he told

Mr. Harley that he had a warrant, and showed Mr. Harley the original search warrant he

had obtained with a signature and seal.  *Id.*  Browning also testified that he had pointed

to the Magistrate Judge's signature on the document.  According to Browning, the

search lasted a total of about five (5) hours, and that at the conclusion of the search, the

agents left copies of property receipts, which Mr. Harley refused to sign, along with a

copy of the warrant that was unsigned and included attachments.  *See* Def. Ex. 1.[2]

Mr. Harley testified that when the agents entered his residence, he asked several

times to see a warrant but never saw one.  Mr. Harley stated that as Browning

questioned him he asked again to see a warrant, and Browning showed him a document

without a signature, date, case number, or an execute by date (Def. Ex. 1).  Mr. Harley

also stated that he was shown two attachments to the document, attachments "A" and

"B."[3]  According to Mr. Harley, that document (Def. Ex. 1) was the only purported warrant

he saw on the day of the search.  Mr. Harley further testified that he never saw a signed

warrant until he received discovery materials from the government at a later date.  After

being presented with the unsigned and undated document lacking a case number and

an execute by date (Def. Ex. 1), Mr. Harley claims that he noted that it lacked a

signature and refused to sign the property inventory for this reason, in addition to his

contention that the property inventory sheets were not itemized.

### DISCUSSION

The Fourth Amendment guarantees that: "[t]he right of the people to be secure in

---

[2]    During cross examination, Browning testified that Defendant's Exhibit 1
("Def. Ex. 1") represents a version of the copy of the warrant he left with
Mr. Harley.

[3]    Attachments "A" and "B" were not provided at the Hearing.

2

25A

their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched,

and the persons or things to be seized." U.S. Const. amend IV. While there is no

explicit requirement that a warrant be signed, the Fourth Amendment does require that a

warrant be "issue[d]." *Id.* Usually the issuing authority demonstrates that probable

cause exists to justify the search by signing the warrant. *See U.S. v. Jackson*, 617 F.

Supp. 2d 316, 320 (M.D. Pa. 2008). However, apart from a signature, "the following can

constitute indicia of issuance: (1) an indication on the warrant of the date before which

the search must be conducted, (2) the presence of a case number indicating that the

warrant has been filed, (3) the presence of the issuing authority's initials or other

imprimaturs of judicial authority on the warrant, and (4) an in-person acknowledgment by

the issuing authority to the affiant that probable cause has been found." *Id.*

Mr. Harley moves for the suppression of evidence in this case because he claims

that he never saw a signed and dated warrant with a case number or a date to be

executed by during the search of his residence or shortly thereafter. Mr. Harley does

acknowledge that he did eventually see a complete version of the warrant (Gvt. Ex. 1)

when he received discovery materials from the government.

On the other hand, the government argues that even if Browning did not have a

copy of the signed, dated warrant (Gvt. Ex. 1) with him during the search of Mr. Harley's

residence, this at most would result in a technical violation of Federal Rule of Criminal

Procedure 41, but would not be grounds for the suppression of evidence.

Without resolving the issue of credibility as to whether Mr. Harley was presented

with a signed and dated warrant during the search, the Court will deny Mr. Harley's

motion to suppress. As the government explained, the chief issue regarding the

3



suppression of evidence here is whether a warrant issued, not whether the government presented or left a signed and dated copy of the warrant with Mr. Harley during the search. *See United States v. Askew*, No. 08-784, 2010 WL 457535, at *10 (W.D. Pa. Feb. 2, 2010) ("Even though the copy of the search warrant left at petitioner's residence was unsigned, that is not a violation of the Fourth Amendment or Rule 41 . . . such a "defect" would be a technical one, which does not invalidate the search or require suppression of evidence."); *United States v. Lipford*, 203 F.3d 259, 270 (4th Cir. 2000) ("Presuming that [defendant] is correct that some copies of the warrant were signed but that his was not, this was, at most, a technical violation of Federal Rule of Criminal Procedure 41[. . .], and not a violation of the Fourth Amendment. Absent a demonstration of prejudice or bad faith—neither of which is present here—suppression of evidence is not the proper remedy for a violation of Rule 41[. . .] ."). The government demonstrated that a search warrant issued in this case. *See* Gvt. Ex. 1. Therefore, Mr. Harley's Motion will be denied.

## CONCLUSION

For the above stated reasons, Mr. Harley's motion to suppress will be denied. An appropriate order follows.


April 10, 2014                                    /s/ A. Richard Caputo
Date                                             A. Richard Caputo
                                                 United States District Judge



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>vs.<br><br>RICHARD J. HARLEY,<br><br>Defendant | No.  3:12-CR-224<br><br>Honorable A. Richard Caputo<br><br>(Electronically Filed) |

## MOTION FOR A JUDGMENT OF ACQUITTAL
### AND/OR NEW TRIAL OF DEFENDANT, RICHARD J. HARLEY

Defendant, Richard J. Harley, requests that the Court enter Judgment of

Acquittal in his favor or, in the alternative, that the Court award him a new trial.

The basis for this Motion is as follows:

1.     The evidence was insufficient as a matter of law to sustain the charges

contained in the Indictment.

2.     A new trial should be awarded based on the presentation before the jury

of a letter by the United States which indicated that Harley had a previous criminal

conviction.

3.     The Indictment should be dismissed based on the fact that the United

States Attorney presented evidence to the Grand Jury which indicated that Harley



never had the original of the oil promissory note and then presented evidence at trial

that Harley did, in fact, have the original of said note.

Respectfully submitted,

/s/ Joseph A. O'Brien, Esquire
Joseph A. O'Brien, Esquire
*Attorney for Defendant, Richard J. Harley*
Attorney ID: 22103
Oliver, Price & Rhodes
1212 South Abington Road
P.O. Box 240
Clarks Summit, PA 18411
Tel: 570-585-1200
Fax: 570-585-5100
Email: jaob@oprlaw.com

-2-



## CERTIFICATE OF SERVICE

I, **Joseph A. O'Brien, Esquire**, of Oliver, Price & Rhodes, hereby certify that

on the 30th day of December, 2014, I served a true and correct copy of the foregoing

MOTION FOR A JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL OF DEFENDANT,

RICHARD J. HARLEY which was filed pursuant to the rules of civil procedure and

electronically filed and electronically forwarded to:

> Bruce D. Brandler, Esquire
> U.S. Attorney's Office
> 228 Walnut Street
> Harrisburg, PA   17108
> Email: bruce.brandler@usdoj.gov

/s/Joseph A. O'Brien, Esquire

Joseph A. O'Brien, Esquire
*Attorney for Defendant, Richard J. Harley*
Attorney ID: 22103
Oliver, Price & Rhodes
1212 South Abington Road
P.O. Box 240
Clarks Summit, PA 18411
Tel: 570-585-1200
Fax: 570-585-5100
Email: jaob@oprlaw.com

30A

## CERTIFICATE OF NON-CONCURRENCE

I, **Joseph A. O'Brien**, hereby certify that U. S. Attorney Bruce Brandler does

not concur in the Motion for Judgment Acquittal and/or New Trial.

Respectfully submitted,

/s/Joseph A. O'Brien, Esquire
*Attorney for Defendant, Richard J. Harley*
Attorney I.D. No.: 22103
Oliver, Price & Rhodes
1212 South Abington Road
P.O. Box 240
Clarks Summit, PA 18411
Tel: (570) 585-1200
Fax: (570) 585-5100
Email: jaob@oprlaw.com

-4-

31 A

AO 245B   (Rev. 4/2013-MD/PA) Judgment
in a Criminal Case Sheet 1

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>RICHARD J. HARLEY | ) **JUDGMENT IN A CRIMINAL CASE**<br>)<br>)<br>) Case Number: 3:CR-12-224<br>)<br>) USM Number: 08867-067<br>)<br>) Joseph A. O'Brien, Esq.<br>) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)   1 - 23
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:1343 | Wire Fraud | 4/18/2011 | 1 - 15 |
| 18:157(1) | Bankruptcy Fraud | 3/24/2011 | 16 & 17 |
| 18:152(3) | False Statements | 5/29/2012 | 18 - 22 |

    The defendant is sentenced as provided in pages 2 through ____8____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____   ☐ is   ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

11/12/2015
Date of Imposition of Judgment

_Signature of Judge_

A. Richard Caputo, United States District Judge
Name and Title of Judge

11-16-15
Date

AO 245B    (Rev. 4/2013-MD/PA) Judgment
Criminal Case Sheet 1A

Judgment—Page    2    of    8

DEFENDANT:  RICHARD J. HARLEY
CASE NUMBER:  3:CR-12-224

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 1344 | Bank Fraud | 04/2012 | 28 |

AO 245B   (Rev. 4/2013-MD/PA) Judgment in a
in a Criminal Case Sheet 2 — Imprisonment

Judgment — Page  3  of  8

DEFENDANT:  RICHARD J. HARLEY
CASE NUMBER:  3:CR-12-224

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

One Hundred Forty-Four (144) months. This term consists of one hundred forty-four (144) months on each of Counts 1-15 and 23; and terms of sixty (60) months on each of Counts 16-22; all to run concurrently.

In determining this sentence, I have considered the Sentencing Guidelines as well as the purpose of Title 18 U.S.C. § 3553(a) namely (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (con't page 3)

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at      ☐ a.m. ☐ p.m.   on

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑ before 2 p.m. on   11/23/2015

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

☑ The defendant is to contact the United States Marshal's Office no later than three days prior to the above date to be notified of the place of confinement.

## RETURN

I have executed this judgment as follows:

Defendant delivered
on_____ to _____

a _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL



AO 245B    (Rev. 4/2013-MD/PA) Judgment in a
           Criminal Case Sheet 2A — Imprisonment

Judgment—Page ___4___ of ___8___

DEFENDANT:  RICHARD J. HARLEY
CASE NUMBER:  3:CR-12-224

## ADDITIONAL IMPRISONMENT TERMS

(2)      the need for the sentence I impose
   (A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment of the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and,
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
   (3)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
   (4)    the need to provide restitution to any victims of the offense.

Moreover, I find the sentence imposed is reasonable.

You have a statutory right to appeal your conviction and sentence to the United States Court of Appeals. If you are unable to pay the cost of an appeal, then you may apply for leave to appeal in forma pauperis, and, if approved, counsel will be appointed for you and you will not be required to pay any costs. If you so request, the Clerk of Court will prepare and file a notice of appeal on your behalf. With few exceptions, any notice of appeal must be filed within 14 days after sentence is imposed on you.

The defendant shall make restitution, totalling $323,800.00 payable to the Clerk, U.S. District Court, for disbursement to Marshall Silverstein ($259,500.00), Peter Bunche ($21,000.00), Maurice Shufford ($10,000.00), Malcolm Caselle ($10,000.00), Peter Blau ($5,800.00), Henry Cohen ($5,000.00), Bertrand Falls ($5,000.00), Kathleen Kelly ($5,000.00), and  Mary Ann Alexander ($2,500.00). Payment of interest is waived.

During the term of imprisonment, the restitution is payable every three months in an amount, after a telephone allowance, equal to 50 percent of the funds deposited into the defendant's inmate trust fund account.

In the event the restitution is not paid in full prior to the commencement of supervised release, the defendant shall, as a condition of supervised release, satisfy the amount due in monthly installments of no less than $200, to commence 30 days after release from confinement.

AO 245B   (Rev. 4/2013-MD/PA) Judgment in a Criminal Case
          Sheet 3 — Supervised Release

|  | Judgment—Page | 5 | of | 8 |

DEFENDANT:   RICHARD J. HARLEY
CASE NUMBER:  3:CR-12-224

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

three (3) years. This term consists of three (3) years on each of Counts 1-23, to run concurrently.

      The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☑ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐ The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

      If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

      The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  the defendant shall support his or her dependents and meet other family responsibilities;

5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement; and

14) the defendant shall notify the court of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines, or special assessments.

AO 245B    (Rev. 4/2013-MD/PA) Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page  6  of  8

DEFENDANT:  RICHARD J. HARLEY
CASE NUMBER:  3:CR-12-224

## ADDITIONAL SUPERVISED RELEASE TERMS

1) The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment schedule for payment of restitution or special assessment;

2) The defendant shall provide the probation officer with access to any requested financial information; and

3) The defendant shall apply all monies received from income tax refunds, lottery winnings, judgments, and/or other anticipated or unexpected financial gains to the outstanding court-ordered financial obligation.

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

Signed_____        Date:_____
              Defendant

Signed_____        Date:_____
              U.S. Probation Officer/Designated Witness

AO 245B    (Rev. 4/2013—MARev) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Case 3:12-cr-00224-ARC    Document 214    Filed 11/16/15    Page 7 of 8

Judgment — Page    7    of    8

DEFENDANT:  RICHARD J. HARLEY
CASE NUMBER:  3:CR-12-224

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 2,300.00 | $ | $ |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Clerk, U.S. District Court, for disbursement to: | | | |
| Marshall Silverstein | | $259,500.00 | |
| Peter Bunche | | $21,000.00 | |
| Maurice Shufford | | $10,000.00 | |
| Malcolm Caselle | | $10,000.00 | |
| Peter Blau | | $5,800.00 | |
| Henry Cohen | | $5,000.00 | |
| Betrand Falls | | $5,000.00 | |
| Kathleen Kelly | | $5,000.00 | |
| Mary Ann Alexander | | $2,500.00 | |
| **TOTALS** | $ 0.00 | $ 323,800.00 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the    ☐ fine   ☑ restitution.

☐  the interest requirement for the    ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: RICHARD J. HARLEY                                          Judgment — Page    8    of    8
CASE NUMBER: 3:CR-12-224

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay,, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __2,300.00__ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance    ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
    term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

    Defendant shall pay a special assessment of $2,300.00. This sum shall be paid to the Clerk, U.S. District Court,
    and is due immediately.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
    and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

      v.

RICHARD J. HARLEY,

      Defendant.

NO. 12-CR-224

(JUDGE CAPUTO)

### ORDER

**NOW**, this 1st day of February, 2016, **IT IS HEREBY ORDERED** that:

(1)    Defendant Richard J. Harley's Motion for a Judgment of Acquittal or a New Trial (Doc. 168) is **DENIED.**

(2)    Defendant Richard J. Harley's Motion to Dismiss the Indictment, to Set Aside the Verdict, and for Ineffective Assistance of Counsel (Doc. 218) is **DENIED.**

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

RICHARD J. HARLEY,

Defendant.

NO. 12-CR-224

(JUDGE CAPUTO)

### MEMORANDUM

Presently before me are two (2) post-trial motions filed by Defendant Richard J. Harley ("Defendant" or "Harley"): (1) Harley's Motion for a Judgment of Acquittal or a New Trial (Doc. 168) and (2) Harley's Motion to Dismiss the Indictment, to Set Aside the Verdict, and for Ineffective Assistance of Counsel (Doc. 218). Harley argues that he is entitled to an acquittal because the Government failed to satisfy its burden of establishing that Harley acted with the requisite intent. In the alternative, he argues that a new trial is warranted based on (1) the presentation to the jury of evidence regarding his criminal history and (2) inconsistent evidence provided by the United States before the Grand Jury and at trial. Because I find that there was sufficient evidence to sustain Harley's conviction, his Motion for a Judgment of Acquittal will be denied. Because I find that Harley has failed to establish that there was a miscarriage of justice, his Motion for a New Trial will also be denied. Harley's Motion to Dismiss the Indictment, to Set Aside the Verdict, and for Ineffective Assistance of Counsel will also be denied.

### I. Background

On August 30, 2012, Harley was indicted by a Grand Jury on twenty-three (23) counts of wire fraud, bankruptcy fraud, and false statements in connection with bankruptcy and bank fraud. (Doc. 1.) The basis for these charges are three (3) alleged schemes to defraud in which Harley participated.

The first scheme involves the ownership of oil in Texas. Harley defrauded individuals

and financial institutions by claiming that his company, RJH & Company ("RJH"), owned over one million dollars ($1,000,000.00) in oil located in Texas. Harley solicited loans and investments from individuals and financial institutions based on this claim of ownership.

The second scheme involves the ownership of bank instruments. Harley falsely claimed that RJH owned Federal Reserve Bank instruments totaling one billion dollars ($1,000,000,000.00) and solicited financial and lending institutions to negotiate, deposit, manage, and loan money against these funds.

The third scheme involves bankruptcy proceedings filed by Harley and RJH. Harley attempted to defraud creditors by filing false and fraudulent bankruptcy petitions in the United States Bankruptcy Court.

On October 16, 2012, Harley entered a plea of not guilty and was granted a pre-trial release on a one hundred thousand dollar ($100,000.00) unsecured bond. On December 3, 2014, a jury trial commenced and on December 15, 2014, Harley moved for a judgment of acquittal, which was denied. On December 16, 2014, the jury entered a guilty verdict on all twenty-three (23) counts against Harley.

On November 16, 2015, judgment was entered against Harley and he was committed to prison for a term of one-hundred and forty-four (144) months on each of Counts 1-15 and 23; and terms of sixty (60) months on each of Counts 16-22, all to run concurrently. Harley was ordered to make restitution totaling three hundred twenty-thousand eight hundred dollars ($323,800.00). No fine was imposed. Upon release from imprisonment, Harley shall be on Supervised Release for three (3) years on each of Counts 1-23, to run concurrently.

## II. Discussion

Harley has moved (1) for a judgment of acquittal or a new trial and (2) to dismiss the Indictment, to set aside the verdict, and for ineffective assistance of counsel. Each motion will be discussed in turn.

2

**A.    Motion for a Judgment of Acquittal (Doc. 168)**

On December 30, 2014, Harley filed a motion for a judgment of acquittal or a new trial. (Doc. 168.) He filed a supporting brief on June 17, 2015. (Doc. 200.) On July 1, 2015, the United States filed a brief in opposition to Harley's motion. (Doc. 202.) Although Harley's reply brief was due by July 20, 2015, no reply was filed. His motion is now ripe for disposition.

Rule 29 of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Third Circuit Court of Appeals has stated that the relevant inquiry in deciding a motion for a judgment of acquittal is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McIntyre*, 612 F. App'x 77, 78 (3d Cir. 2015) (citation and internal quotation marks omitted); *see also Jackson v. Virginia*, 99 S.Ct. 2781, 2789 (1979) (stating the same legal standard). Deference must be afforded to the jury's findings and all reasonable inferences must be drawn in favor of the jury's verdict. *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010).

**1.    Wire Fraud Charges Contained in Counts 1-15**

First, Harley argues that I should grant his motion for an acquittal and enter a verdict of not guilty on the wire fraud charges contained in Counts 1-15 of the Indictment. To prove wire fraud, the Government must prove beyond a reasonable doubt (1) that Harley knowingly and willfully participated in a scheme or artifice to defraud with the specific intent to defraud; and (2) the use of the mail or interstate wire communications in furtherance of the scheme. *United States v. Sawyer*, 85 F.3d 713, 722 (1st Cir. 1996); *Phila. Reserve Supply Co. v. Nowalk & Assocs., Inc.*, 846 F. Supp. 1456, 1470-71 (E.D. Pa. 1994).

43A

Harley argues that there was insufficient evidence to establish the first element, that he **knew** that the Texas oil investment or the Federal Reserve checks were fraudulent or that he **intended** to make any misrepresentation to the companies and individuals to whom he presented these investment opportunities. In opposition, the Government argues that there was overwhelming evidence that Harley acted knowingly and with intent to defraud. Because I find that sufficient evidence was presented on this element, Harley's motion for a judgment of acquittal with respect to the wire fraud charges contained in Counts 1-15 of the Indictment will be denied.

### a.    Harley Knew That the Texas Oil Investment Was Fraudulent

First, the Government accurately points out that Harley's claim that he owned over one billion dollars ($1,000,000,000.00) of oil located in Texas is sufficiently incredulous that any reasonable juror could have disbelieved it.

Second, F.B.I. Special Agent Vincent Browning ("S.A. Browning") testified at trial that Harley told him that his income consisted of five hundred and thirty-five dollars ($535.00) per month in Social Security income. (Doc. 180, Tr. 12/11/14, 31:11-15.) According to S.A. Browning's trial testimony, Harley informed him that he possessed a valid, signed, two hundred million dollar ($200,000,000.00) original oil promissory production note from Enpetro, yet when asked why he did not call the note due given his limited income, Harley stated that he "preferred to hold the asset and just try to borrow against its value." (*Id.* at 36:9-37:8.) Harley then stated that he did not think that Enpetro had the money to pay him. (*Id.* at 37:8-13.)  S.A. Browning also testified that when he pressed Harley on what consideration he gave Enpetro in exchange for the two hundred million dollar ($200,000,000.00) note, Harley "didn't want to talk further about his financial dealings" and that "it was kind of the end of that oil discussion." (*Id.* at 38:1-6.) In light of this evidence that Harley never called his two hundred million dollar ($200,000,000.00) note due despite

4

44A

having no source of income besides five hundred and thirty-five dollars ($535.00) per month in Social Security income, the jury could have reasonably inferred that Harley knew that his note and collateral were worthless.

Third, oil geologist Donald Kesterson acknowledged that there had been no production on any of the wells since 1993, and that fact was conveyed to Harley in Kesterson's July 3, 1999 report. (*See* Doc. 193, Tr. 12/12/14, 106:5-8; 107:25-108:8; *see also* Doc. 218, Ex. G.) Kesterson also testified that Harley falsely told him that the wells were in production as of 1999. (*Id.* at 85:1-22.) Based on Kesterson's testimony that Harley lied to him about the wells being in production in 1999, the jury could have reasonably inferred that Harley knew that the collateral was worthless.

In addition, there was circumstantial evidence showing that Harley intended to defraud his victims. For example, S.A. Browning testified that Harley obtained money from his victims that they demanded he use for investments, but then instead of investing that money, he spent it on his mortgage payments, household expenses, and a Lexus automobile. (*See, e.g.,* Doc. 180, Tr. 12/11/14, 31:16-33:25.) Harley also lied about his education and wealth, claiming to have a Ph.D., to have discovered a cure for AIDS, and to own artwork valued at millions of dollars. (*See, e.g.,* Doc. 178, Tr. 12/5/14, 150:20-151:23; Doc. 181, Tr. 12/4/14, 105:24-106:2.) Taken together, a reasonable juror could have inferred that Harley knew the Texas oil investment was fraudulent and that he intended to make misrepresentations to individuals to whom he presented investment opportunities.

      **b.**    **Harley Knew That the Federal Reserve Checks Were Fraudulent**

First, the Government accurately points out that Harley's claim that he owned trillions of dollars in Federal Reserve instruments is sufficiently incredulous that any reasonable juror could have disbelieved it.

Second, direct evidence of Harley's state of mind was introduced with testimony from

45A

various Federal Reserve Bank officials that they frequently communicated with Harley and repeatedly informed him that the Treasury checks and associated documents that he claimed to be valid were bogus and part of a well-known scheme to defraud the Federal Reserve Bank. (*See, e.g.*, Doc. 185, Tr. 12/3/14, 54:1-58:4 (testimony of Richard Jones, General Counsel for the Federal Reserve Bank of Atlanta); Doc. 181, Tr. 12/4/14, 83:11-85:10 (testimony of Leonard Zawistowski, former investigator for the Board of Governors of the Federal Reserve System); Doc. 181, Tr. 12/4/14, 106:16-114:8 (testimony of Sahil Godiwala, Managing Director at the Bank of New York Mellon and former counsel at the Federal Reserve Bank of New York).) In one conversation, Harley was told that it was a federal crime to attempt to negotiate these checks. (Doc. 181, Tr. 12/4/14, 109:12-18 (testimony of Sahil Godiwala).) However, Harley continued to make false representations about the legitimacy of the checks well after those conversations. Based on his persistent representations of these checks even after being repeatedly informed by officials that they were bogus, a reasonable juror could have concluded that Harley knew the checks were fraudulent and possessed an intent to defraud.

Third, circumstantial evidence of Harley's state of mind was introduced through S.A. Browning's testimony that he found numerous incriminating documents in Harley's residence and on Harley's computer as a result of a search conducted on August 29, 2012. For example, the print-out of a document entitled "Scam Involving Yohannes Riyadi and/or Wilfredo Saurin November 2007," pulled off of the Federal Reserve Bank of New York website, was found in Harley's residence. (*See* Govt. Ex. 23.8(B).) This printout, which advised the public of the fraudulent nature of Harley's documents and described Harley's scheme, *i.e.*, fraudsters attempting to use the fraudulent documentation as collateral for lines of credit or other types of asset-based financing, was admitted into evidence and presented to the jury.

Additionally, S.A. Browning testified that during the course of his search of Harley's residence, he found a document entitled "Overview of a Conversation with Richard A. Jones, general counsel and myself," which was Harley's own characterization of a

conversation he had with Richard Jones, showing that Jones told Harley that his documents were all bogus. (*See* Doc. 180, Tr. 12/11/14, 89:8-90:6; *see also* Gov. Ex. 23.9.)

Other incriminating documents found during the August 29, 2012 search indicated that Harley actually created the fraudulent Federal Reserve documents. For example, S.A. Browning testified to a print-out of an April 30, 2009 e-mail from Harley to "josefteo@gmail.com" entitled "verbiage." (Doc. 180, Tr. 12/11/14, 96:12-98:11; *see also* Gov. Ex. 23.15.) This e-mail goes on to request "Joseph" to write a letter on bank letterhead claiming that the Treasury checks are valid. (Gov. Ex. 23.15.) Attached were copies of the bogus "to whom it may concern" letters on what purported to be Federal Reserve Bank letterhead dated May 4, 2009, claiming that the Treasury checks are valid. One version had a typed signature from Ben S. Bernanke, former Chairman of the Federal Reserve System; the other was signed. Other images of signatures of various individuals, including Ben S. Bernanke, were also introduced. (*See* Gov. Exs. 23.16, 17, 18, & 19.).

Based on all of the above evidence, a jury could reasonably conclude that Harley not only knew that his documents were fraudulent, but that what he was doing was illegal. Accordingly, Harley's motion for a judgment of an acquittal of the wire fraud charges in Counts 1-15 of the Indictment will be denied.

### 2.    Bank Fraud Charges Contained in Count 23

Second, Harley argues for an acquittal of the bank fraud charges contained in Count 23 of the Indictment. Count 23 charges Harley with bank fraud in connection with his repeated attempts between April 2009 and April 2012 to defraud the Federal Reserve Bank of New York by negotiating, depositing, and using two (2) fraudulent five hundred million dollar ($500,000,000.00) checks purportedly issued by the Federal Reserve Bank of New York for collateral on loans with other financial institutions. Harley argues that there was insufficient evidence to prove that he knew that the checks were fraudulent.

However, as stated above, there was direct evidence of Harley's state of mind presented at trial. Specifically, there was evidence that Harley was repeatedly told by Federal Reserve Bank officials that the checks were fraudulent, and there was significant

47A

evidence found during the search of his residence showing that he created the fraudulent Federal Reserve Bank documents. Therefore, Harley's motion for a judgment of acquittal on the bank fraud charges contained in Count 23 will be denied.

### 3.    Bankruptcy Fraud Charges Contained in Counts 16 and 17

Third, Harley argues for an acquittal of the bankruptcy fraud charges contained in Counts 16 and 17 of the Indictment. Counts 16 and 17 charge Harley with bankruptcy fraud based on two (2) corporate bankruptcy petitions that he filed on behalf of RJH, which was the debtor on a two million dollar ($2,000,000.00) secured corporate promissory note issued to Marshall Silverstein, a victim of Harley's schemes. Harley claims that there was insufficient evidence to prove that the filings constituted a scheme to defraud Silverstein. However, I find that sufficient evidence was presented.

First, Kevin Fogerty, Silverstein's attorney, testified at great length regarding the bankruptcy petitions filed on behalf of Harley and RJH and discussed the reasons he had for believing that these petitions were filed in bad faith. (See Doc. 178, Tr. 12/5/14, 132:19-145:25.) For example, the November 22, 2010 bankruptcy petition was filed immediately prior to a pre-trial conference where Fogerty was seeking sanctions against Harley and entry of a judgment for Harley's refusal to appear for depositions. The pre-trial conference was cancelled when Fogerty and the Court were notified the day before the hearing that the petition was filed due to the automatic stay provision of the Bankruptcy Code. The records of the bankruptcy court show that Harley never pursued the petition after it was filed. Rather, it was dismissed on December 28, 2010, for failure to pay the filing fee. A jury could reasonably conclude that the only reason Harley filed the petition was to defraud Silverstein and frustrate his attempts to get a judgment, which constitutes "bad faith" under the Bankruptcy Code.

Additionally, Fogerty also testified that Harley filed a second bankruptcy petition for RJH on March 24, 2011, the day before the hearing was scheduled, on the same issues that were to be litigated on December 14, 2010. (Doc. 178, Tr. 12/5/14, 138:18-139:13.) Due to the second bankruptcy petition, the rescheduled hearing was cancelled. (Id.) In

8

fact, in a separate hearing conducted in bankruptcy court, Harley testified under oath that one of the reasons he filed the second bankruptcy petition was to prevent the hearing on March 25, 2011. (*Id.* at 140:16-21.) A reasonable juror could conclude that Harley filed a second bankruptcy petition to defraud Silverstein and frustrate his attempts to get a judgment in the state court proceeding. Therefore, Harley's motion for a judgment of acquittal on the bankruptcy fraud charges contained in Counts 16 and 17 of the Indictment will be denied.

### 4.     False Statement Charges Contained in Counts 18-22

Lastly, Harley argues that I should grant his motion for acquittal on the false statement charges contained in Counts 18-22 of the Indictment. Specifically, he claims that although "there were some mistakes made in the information provided on the bankruptcy petitions," the record contains  no evidence that the mistakes were "knowingly or fraudulently made." (Doc. 200, at 17.) However, sufficient evidence was presented at trial that he knowingly and willfully made materially false declarations on his three (3) bankruptcy petitions.

With respect to Count 18, the 2010 bankruptcy petition falsely stated that RJH had assets totaling seven hundred sixty-five million dollars ($765,000,000.00), including ten (10) million barrels of proven reserves valued at seven hundred million dollars ($700,000,000.00). A reasonable juror could conclude that this was no simple mistake and that Harley knew that his oil promissory note and assignment of collateral were worthless. This is also true of Count 19, which pertains to the 2011 bankruptcy petition, which alleged that RJH had assets totaling seven hundred sixty-five million dollars ($765,000,000.00), including ten (10) million barrels of proven reserves valued at seven hundred million dollars ($700,000,000.00).

With respect to Count 20, Harley's 2012 personal bankruptcy petition failed to list Silverstein, the Securities and Exchange Commission, and the United States as creditors. (*See* Gov. Ex. 20.1; *see also* Doc. 192, 12/9/14 Tr. 170:1-172:4.) Evidence at trial showed that Harley was well aware of these judgments, particularly the Silverstein judgment, which

9

had recently been entered against him personally on August 11, 2011, and was the ongoing subject of collection efforts by Fogerty at the time the petition was filed. Harley himself listed Silverstein as a creditor of RJH in his 2010 and 2011 petitions, so there is little doubt that he realized Silverstein was owed over one million dollars ($1,000,000.00) by virtue of a judgment in Lehigh County.

In addition, Karen Musloski, a paralegal specialist with the United States Attorney's Office for the Middle District of Pennsylvania, testified that the United States had a judgment against Harley for one hundred sixty-eight thousand eight hundred and two dollars ($168,802.00) as of March 30, 2001. (Doc. 192, 12/9/14 Tr. 5:18-6:1.) She testified that Harley was repeatedly notified about this debt, including the filing of lien documents in March 2009 with the Monroe County Court of Common Pleas and with two (2) collection letters in May 2011 and August 2011. (Doc. 192, 12/9/14 Tr. 7:13-13:6.) Therefore, a reasonable juror could conclude that Harley's omission of the debt was knowing and willful and not a simple mistake.

Count 21 alleged that Harley made other false statements in his 2012 personal bankruptcy petition, such as failing to state that he was an officer of RJH. (*See* Doc. 192, 12/9/14 Tr. 174:3-174:7.) Harley repeatedly told his victims that he was the Chief Executive Officer of RJH and signed all of his correspondence using that title, including his prior corporate bankruptcy petitions. Therefore, there was sufficient evidence for the jury to reasonably conclude that Harley knowingly and willfully omitted this information.

Count 22 alleged that in his 2012 personal bankruptcy petition, Harley failed to list all personal property owned by him and his wife, including various artwork. (*See* Gov. Ex. 20.1.) For example, he failed to list bank accounts that he controlled at Merrill Lynch, Penn Security, and Wachovia, where most of the victims' money ended up going. (*Id.*) Therefore, there was sufficient evidence for the jury to conclude that Harley knowingly and willfully omitted this information from his personal bankruptcy petition. Accordingly, Harley's motion for a judgment of acquittal of the false statement charges contained in Counts 18-22 of the Indictment will be denied.

10

**B.    Motion for a New Trial (Doc. 168)**

Harley has also moved for a new trial pursuant to Rule 33(a) of the Federal Rules of
Criminal Procedure. Rule 33(a) permits the court to vacate any judgment and grant a new
trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court "can order
a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only
if it believes that there is a serious danger that a miscarriage of justice has occurred–that
is, that an innocent person has been convicted." *United States v. Johnson*, 302 F.3d 139,
150 (3d Cir. 2002) (citation and internal quotation marks omitted). Under Rule 33, the court
does not view the evidence in the light most favorable to the government. Rather, the court
must exercise its own judgment in assessing the government's case. *United States v.
Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008).

Harley offers two (2) grounds for a new trial, based on (1) the presentation to the jury
of evidence regarding his criminal history and (2) inconsistent evidence provided by the
United States before the Grand Jury and at trial concerning the location of the original
promissory note. In opposition, the Government argues that a new trial is not warranted on
either of these grounds and that Harley has failed to demonstrate any miscarriage of justice
that would warrant a new trial.

**1.    Harley's Criminal History**

First, Harley argues that I should grant a new trial due to the presentation before the
jury of evidence regarding his prior involvement with the criminal justice system.
Specifically, during the testimony of Karen Musloski, Government Ex. 20.6E was displayed
to the jury, which reflects a "criminal" docket number for the monetary judgment that
Musloski was testifying about. No objection was made at the time the document was
displayed or prior to trial when all of the Government's exhibits were turned over to the
defense for review. The parties agreed to redact the word "criminal" in the caption of the
document before it went to the jury with all of the other evidence. Although I had indicated
that I would give a curative instruction if the defense requested, the defense declined.

There was no miscarriage of justice with the inadvertent display of this document.

First, there is no evidence that any juror noticed the word "criminal" during the few moments that the document was displayed. Second, the display was apparently not significant enough for defense counsel to request a curative instruction or move for a mistrial. Finally, the Third Circuit Court of Appeals has held that inadvertent disclosures far worse than this one were harmless. *See, e.g., United States v. Self*, 681 F.3d 190, 199 (3d Cir. 2012) (holding that testimony that the defendant was "already in jail" was harmless, noting that the comment was "brief, isolated, and unsolicited"); *United States v. Greenstein*, 322 F. App'x 259, 264 (3d Cir. 2009) (holding that the use of the term "police photo" by the prosecutor and "weapons violation" by the witness was harmless). Therefore, the brief display of the word "criminal" in the caption of Government Ex. 20.6(E) was harmless and does not warrant a new trial.

### 2. Inconsistent Evidence Concerning the Location of the Original Oil Promissory Note

Second, Harley argues that I should grant a new trial due to inconsistent evidence provided by the United States before the Grand Jury and at trial concerning the location of the original oil promissory note. Specifically, Harley claims that there is inconsistency between the Grand Jury testimony of Stan Dedmon and William Trantham and the trial testimony of S.A. Browning regarding the location of the "original" oil promissory note. Even if this were true, this would not be grounds for a new trial. Neither Dedmon nor Trantham testified at trial. Rather, S.A. Browning testified that he found what appeared to be five (5) "original" oil promissory notes in Harley's possession. (*See* Doc. 180, 12/11/14 Tr. 72:16-73:15.) Defense counsel could have called Dedmon or Trantham as witnesses if he believed that they would impeach S.A. Browning. Yet, he chose not to. There is no basis for suggesting that this alleged inconsistency about the location of the original oil note impacted the trial. Therefore, Harley's motion for a new trial will be denied.

### C. Motion to Dismiss the Indictment, to Set Aside the Verdict, and for Ineffective Assistance of Counsel (Doc. 218)

On November 19, 2015, Harley filed a motion to dismiss his Indictment, set aside the verdict, and for ineffective assistance of counsel. (Doc. 218.) Harley argues for a

dismissal of the Indictment based on perjured testimony presented before the Grand Jury. Specifically, Harley asserts that (1) Stan Dedmon and William Trantham conspired to present false testimony to the Grand Jury as to the existence of the original note and the original collateral of assignment; (2) Donald Kesterson falsely testified that he never got in touch with Christie Bower, Esq., regarding the safe-keeping of the original note; and (3) Assistant U.S. Attorney ("AUSA") Brandler made false statements to the Grand Jury pertaining to ownership of a $45,000.00 automobile and falsely stated that he did not find any evidence establishing Harley's ownership of oil. Harley adds that his attorney was put on notice of these false statements for more than a year but failed to bring the matter to the attention of the Court. Although the time for the Government to file an opposition has expired, they have not filed one. Accordingly, this motion is ripe for disposition.

    **1.**    **Motion to Dismiss the Indictment and Set Aside the Verdict**

    Harley has moved for dismissal of his Indictment based on purportedly perjured testimony during the Grand Jury proceedings. The Supreme Court has held that dismissal of an Indictment is only appropriate "if it is established that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (citation and internal quotation marks omitted). A district court "may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Id.* at 254. Moreover, if a petit jury convicts the defendant of charges contained in a wrongfully obtained Indictment, "'any error in the grand jury proceeding connected with the charging decision [is deemed] harmless beyond a reasonable doubt.'" *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1206 (C.D. Cal. 2011) (quoting *United States v. Mechanik*, 475 U.S. 66, 70). In other words, "once there is a jury verdict, the task of arguing for dismissal of an indictment based solely on errors in a grand

jury proceeding becomes nearly insurmountable." *Aguilar*, 831 F. Supp. 2d at 1206.[1] Once there is a jury verdict, dismissal of the Indictment is appropriate only if "the structural protections of the grand jury . . . [were] so compromised as to render the proceedings fundamentally unfair." *Bank of Nova Scotia*, 487 U.S. at 257. As once noted by the Ninth Circuit Court of Appeals, "[t]he only structural errors the Supreme Court has recognized are racial and gender discrimination in the selection of grand jurors." *United States v. Bingham*, 653 F.3d 983, 998 (9th Cir. 2011) (citing *Bank of Nova Scotia*, 487 U.S. at 257). Because it is a drastic step, dismissing an Indictment is a disfavored remedy. *United States v. Blue*, 384 U.S. 251, 255 (1966). The Third Circuit Court of Appeals has once noted that upon review of Third Circuit cases in which it found prosecutorial misconduct before the Grand Jury, the Indictment was not dismissed in a single one of those cases. *Martino*, 825 F.2d at 759. Instead, the Third Circuit looks to "whether there was sufficient evidence to support the indictment" and in almost all cases, the Third Circuit has "determined that the misconduct was harmless error and not prejudicial." *Id.* Courts are instructed not to focus on the misconduct itself, but on whether there was any prejudice. *Id.*

First, Harley argues that Stanley Dedmon, owner of Enpetro, falsely testified at the Grand Jury proceedings that he never sent an original copy of Enpetro's two hundred million dollar ($200,000,000.00) promissory note to anyone. To demonstrate the falsity of this testimony, Harley submits an FBI document dated September 5, 2000, summarizing an interview conducted with Dedmon, in which Dedmon confirms that Enpetro executed the note to RJH and that he sent the note and the assignment of collateral to Harley. (*See* Doc. 218, Ex. A.)

Second, Harley argues that William Trantham, an attorney who signs corporate documents for Enpetro, falsely testified at the Grand Jury proceedings that to his

---

[1]      Ironically, *Aguilar* is a case that Defendant urged I consider at oral argument.

knowledge, the original note was never tendered to Harley, and that he did not know where the original note was and that he believed it went to a landfill.    To demonstrate the falsity of this testimony, Harley submits an FBI document dated September 5, 2000, summarizing an interview conducted with Trantham, in which Trantham "identified his signature on a $200 million promissory note payable to RJH," which was "owned by RICHARD HARLEY." (*See* Doc. 218, Ex. B.) The document reflects that Trantham did not recall the purpose of the note but believed it was to be used to raise capital.    Harley adds that the FBI document's representation that Trantham unsuccessfully attempted to get the original note back from Harley is also false, because he never spoke to Trantham.    However, at oral argument, Harley conceded that there was no evidence that he never actually spoke to Trantham, and therefore has no proof that this was a false statement.

Third, Harley argues that Donald C. Kesterson, the oil geologist, falsely testified to the Grand Jury that he never got in touch with Christie Bower, nor did he try to, and that he believed that they did get in touch at one point to verify that she had the original note. However, Harley provides no evidence that this testimony was false.    He only attaches letters addressed to him from Christie Bower, Esq., verifying the safe-keeping of his oil production note, assignment of collateral, and geological reports.    However, these letters do not demonstrate that Kesterson's testimony was false.

Fourth, Harley argues that there was an inconsistency between AUSA Brandler's statement to the Grand Jury regarding a forty-five thousand dollar ($45,000.00) Lexus automobile titled to Harley and the Government's brief in opposition to Harley's motion for judgment of acquittal, in which the Government states that the automobile was valued at forty thousand dollars ($40,000.00) and titled to RJH.    Harley also argues that AUSA Brandler's statement at the Grand Jury proceedings that he had seen nothing indicating Harley's ownership in oil was false.    Harley maintains that this must have been false

53A

because (1) Kesterson's report to Harley states that "based on the wording of the Collateral Assignment in my opinion Enpetro must maintain these Oil Reserves on behalf of RJH" and also includes a line pertaining to "*your*" Oil Promissory Note and Collateral of Assignment "*from*" Enpetro." (*See* Doc. 218, Ex. G.)

First, it is unclear that several of these statements were actually false. For example, the excerpts that Harley highlights from Kesterson's report do not clearly demonstrate Harley's ownership in oil, and therefore do not clearly demonstrate that AUSA Brandler lied when he stated that he found nothing showing Harley's ownership in oil.[2]

More importantly, however, even assuming that they were false statements, there is no indication of how any of these statements "substantially influenced the grand jury's decision to indict," nor did these statements create "grave doubt" that the grand jury's decision to indict was free from the substantial influence of the purportedly perjured testimony. *Bank of Nova Scotia*, 487 U.S. at 256 (citation and internal quotation marks omitted). And as explained earlier, "the petit jury's guilty verdict[] render[s] harmless any possible error in the grand jury proceedings." *United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004) (citing *Mechanik*, 475 U.S. at 72-73). Accordingly, Harley's motion for dismissal of the Indictment will be denied.

At oral argument, Harley urged that I consider two (2) cases he had not previously raised in his briefs. However, the first case, *Coleman v. Thompson*, 501 U.S. 719 (1991), bears no relevance to his motion at hand, as it involves a procedural default as the result of ineffective assistance of counsel in the context of federal habeas review. Harley has not filed a petition for habeas review, nor has there been any procedural default. The second case, *United States v. Aguilar*, 831 F. Supp. 2d 1180 (C.D. Cal. 2011), bears some relevance, but is inapposite because the prosecutorial misconduct in that case was so

---

[2]    Because AUSA Brandler was not a witness sworn under oath during the Grand Jury proceedings, there is no issue of perjury. *United States v. Seavey*, 180 F.2d 837, 839 (3d Cir. 1950).

56A

egregious that it cannot fairly be compared to the case at hand. In *Aguilar*, the court emphasized a long ***pattern*** of prosecutorial misconduct dating back before the Indictment that continued all throughout trial. *Id.* at 1182-1206. The Government's misconduct included procuring search and seizure warrants through materially false and misleading affidavits; making several materially false statements to the Grand Jury, including much of which was made in response to questions from jurors during the proceedings; improperly obtaining attorney-client privileged communications; violating court orders; questioning witnesses improperly; failing to produce multiple FBI statements until after the Government had already rested its case at trial, including one statement that was found to be potentially exculpatory; and engaging in questionable behavior during closing arguments. *Id.* at 1182-1206. The handful of purportedly false statements made during Harley's Grand Jury proceedings, none of which was material, pales in comparison to the pattern of gross misconduct in *Aguilar*.

Harley also appears to argue that his Fifth Amendment right to due process has been violated because he was forced to stand trial on an Indictment that the Government knew to be based partially on perjured material. In order to set aside a verdict based on perjured testimony, Harley must show that (1) perjury was committed; (2) the Government knew or should have known of this perjury; (3) the testimony was uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict. *Lambert v. Blackwell*, 387 F.3d 210, 242-43 (3d Cir. 2004). Harley has fallen far short of establishing these elements. As noted above, he has not provided sufficient evidence demonstrating that the statements he highlights constitute perjury. Additionally, he has not provided sufficient evidence demonstrating that the Government knew or should have known of this perjury. Finally, he has not made any argument as to the reasonable likelihood that any of this testimony could have affected the verdict. Given the trivial nature of many of these purported inconsistencies, such as AUSA Brandler's initial statement that Harley's Lexus was valued at forty-five thousand dollars ($45,000.00) and the Government's later statement that the Lexus was valued at forty-thousand dollars ($40,000.00) and titled to

17

RJH, it is unlikely that these statements affected the jury verdict. Accordingly, Harley's motion to set aside the verdict will be denied.

## 2.   Motion for Ineffective Assistance of Counsel

Harley also argues that his attorney was put on notice regarding the perjured testimony but refused to bring the matter to the attention of the Court. Specifically, Harley notes that his attorney was put on notice of this testimony by fax as early as June 16, 2014. For this reason, Harley asserts that his Sixth Amendment right to effective assistance of counsel has been violated.

To successfully present an ineffective assistance of counsel claim, a defendant must establish that (1) the performance of counsel fell below an objective standard of reasonableness and (2) the errors of counsel prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The first prong requires the defendant to show that counsel's performance was "deficient" and that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001). There is a strong presumption that counsel's performance was reasonable. *Id.* The second prong requires the defendant to demonstrate that there is a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.*

Here, Harley makes blanket assertions that there was ineffective assistance of counsel due to (1) "a significant break down in communication before and during trial," (2) a "[f]ailure to investigate," (3) a "[f]ailure to contact witnesses of the defendants [sic] choosing," and (4) a "[f]ailure to file [a] meritorious motion on defendant's behalf." (Doc. 218, at 5-6.) Harley also adds that counsel was on notice of the perjured testimony discussed above but failed to take any action on his behalf. These blanket assertions fail to assert an ineffective assistance of counsel claim. For example, Harley fails to explain what the significant breakdown in communications was with his counsel or when it occurred. He also fails to explain what his counsel failed to investigate, which witnesses his counsel

18

failed to contact, or what motions his counsel failed to file. This fails to establish that he was prejudiced by his counsel's performance. *See, e.g., United States v. Mangiardi*, 173 F. Supp. 2d 292, 315 (M.D. Pa. 2001) (explaining that when a defendant claims that his trial counsel failed to call a specific witness, "he must make a specific showing as to what the evidence would have been, and prove that this witness's testimony would have produced a different result. Otherwise, the prejudice prong under *Strickland* is not satisfied."). Harley also fails to demonstrate how his counsel's failure to take action with regard to the purportedly perjured testimony he highlights above caused him prejudice, particularly given the overwhelming evidence that was presented at trial against him, such as testimony from S.A. Browning or Richard Jones, none of which Harley has objected to. Accordingly, Harley's Motion for Ineffective Assistance of Counsel will be denied.

### III. Conclusion

For the above stated reasons, Harley's motions for a judgment of acquittal, a new trial, to dismiss the Indictment, to set aside the verdict, and for ineffective assistance of counsel will all be denied.

An appropriate order follows.

February 1, 2016
Date

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | No. 12-CR-224 |
| | Plaintiff | |
| vs. | | |
| RICHARD J. HARLEY, | | Judge Caputo |
| | Defendant | |

## NOTICE OF APPEAL OF DEFENDANT, RICHARD J. HARLEY

Notice is hereby given that Defendant, Richard J. Harley, appeals to the United States Court of Appeals for the Third Circuit from the Judgment of Sentence against him on November 16, 2015 and from the Order denying his Post-Trial Motions entered by the Court on February 1, 2016.

-1-

60A

Respectfully submitted,

OLIVER, PRICE & RHODES

/s/Joseph A. O'Brien
Joseph A. O'Brien, Esquire
Attorney I.D. No.:   22103
1212 South Abington Road
Clarks Summit, PA    18411
Tel:   (570) 585-1200
Fax:   (570) 585-5100
Email:   jaob@oprlaw.com
*CJA Counsel for Defendant, Richard J. Harley*

## CERTIFICATE OF SERVICE

I, **Joseph A. O'Brien, Esquire**, of Oliver, Price & Rhodes, hereby certify that

on the 8ᵗʰ day of February 2016, I caused the foregoing NOTICE OF APPEAL OF

DEFENDANT, RICHARD J. HARLEY to be filed via the Court's ECF system.  I certify

that the following participants in the case are registered CM/ECF users and that

service will be accomplished by the CM/ECF system:

Robert O'Hara, Esquire
Office of the U.S. Attorney
William J. Nealon Federal Building
235 North Washington Avenue
Scranton, PA   18501

Respectfully submitted,

OLIVER, PRICE & RHODES

/s/Joseph A. O'Brien
Joseph A. O'Brien, Esquire
Attorney I.D. No.:   22103
1212 South Abington Road
Clarks Summit, PA     18411
Tel:  (570) 585-1200
Fax:  (570) 585-5100
Email:  jaob@oprlaw.com
*CJA Counsel for Defendant, Richard J. Harley*