# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

No.  16-1285

## UNITED STATES OF AMERICA,
Appellee

v.

## RICHARD J. HARLEY
Appellant

## APPEAL FROM A JUDGMENT ENTERED IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA AT 3:12-CR-0224
(Caputo, J.)

## BRIEF OF APPELLEE

BRUCE D. BRANDLER
United States Attorney

STEPHEN R. CERUTTI II
Chief, Criminal Appeals
United States Attorney's Office
Middle District of Pennsylvania
Ronald Reagan Federal Building
Suite 220
228 Walnut Street
Harrisburg, Pennsylvania  17108
717-221-4482
Attorneys for Appellee

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF SUBJECT MATTER ANDAPPELLATE
    JURISDICTION ............................................................................... 1

STATEMENT OF THE ISSUES
    AND THE STANDARDS OF REVIEW ........................................... 2

STATEMENT OF THE CASE ................................................................. 4

STATEMENT OF RELATED CASES AND PROCEEDINGS ............... 17

SUMMARY OF ARGUMENT ................................................................. 18

ARGUMENT ......................................................................................... 20

I.    The evidence produced at trial was more than
    sufficient to allow the jury to conclude that Harley
    was guilty of each of the 23 charges against him ................. 20

    A.    There was overwhelming evidence of intent
        to defraud regarding counts one through
        fifteen of the indictment ........................................... 24

        1.    The Texas Oil Scheme .................................... 24

        2.    The Federal Reserve Scheme ......................... 28

        3.    Other Fraudulent Behavior Toward
            His Victims ..................................................... 33

    B.    There was overwhelming evidence of intent
        to defraud regarding count 23 of the indictment ....... 40

C.    There was overwhelming evidence that Harley
      devised a scheme to engage in bankruptcy fraud
      in order to avoid having to pay any money
      judgment to one of his victims ..............................41

D.    There was overwhelming evidence that
      Harley knowingly and willfully made material
      false declarations on his three bankruptcy
      petitions ...........................................................45

E.    Summary .........................................................51

II.   The district court did not commit plain error when
      it refused to order a new trial after a single inadvertent
      reference to a prior criminal matter involving Harley
      was temporarily available to the jury ...........................52

III.  Whether the district court erred in denying Harley's
      motion to suppress evidence discovered during the search
      of his home, when a valid warrant had been issued for the
      search ...................................................................57

IV.   The district court did not err in denying Harley's motion
      to dismiss the indictment when he claimed that the
      United States offered perjured testimony in the grand
      jury proceedings that was allegedly "inconsistent" with
      evidence introduced at trial ......................................62

CONCLUSION ......................................................................67

CERTIFICATE OF BAR MEMBERSHIP / VIRUS SCAN
      CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES                          PAGE

*Bank of Nova Scotia v. United States,*
   487 U.S. 250 (1988) ...............................................................65

*Burks v. United States,*
   437 U.S. 1 (1978) ...................................................................22

*Coleman v. Johnson,*
   132 S. Ct. 2060 (2012) ...........................................................22

*Silverstein v. Harley*, et al.,
   2009-C-5910 (Ct. Com. Pl. Lehigh Cty., 2009) ..........................6

*SEC v. Harley,*
   294 Fed. App'x 711 (3d Cir. 2008) .....................................6, 48

*SEC v. Lazare Industries, Inc., et al.,*
   3:CV-96-0705 .........................................................................48

*United States v. $92,422.57,*
   307 F.3d 137 (3d Cir. 2007) ...................................................60

*United States v. Bergrin,*
   650 F.3d 257 (3d Cir. 2011) .....................................................3

*United States v. Bingham,*
   653 F.3d 983 (9th Cir. 2011) ..................................................65

*United States v. Boria,*
   592 F.3d 476 (3d Cir. 2010) ...................................................21

*United States v. Brodie,*
   403 F.3d 123 (3d Cir. 2005) ...................................................21

*United States v. Caraballo-Rodriguez,*
  726 F.3d 418 (3d Cir. 2013) ...................................2, 21, 22, 51

*United States v. Dunnigan,*
  507 U.S. 87 (1993) ................................................................63

*United States v. Gambone,*
  314 F.3d 163 (3d Cir. 2003) ................................................21

*United States v. Greenstein,*
  322 Fed. App'x 259 (3d Cir. 2009) .........................................56

*United States v. Harley,*
  MDPA No. 3:CR-96-286, DDE 558, *aff'd,*
  39 Fed. App'x 789 (3d Cir. 2002) ..................................6, 47, 52

*United States v. Iafelice,*
  978 F.2d 92 (3d Cir. 1992) ..................................................22

*United States v. Jackson,*
  617 F.Supp.2d 316 (M.D.Pa. 2008) ............................59, 60, 61

*United States v. Leon,*
  739 F.2d 885 (3d Cir. 1984) .............................................22, 51

*United States v. Lipford,*
  203 F.3d 259 (4th Cir. 2000) ................................................60

*See United States v. Martino,*
  825 F.2d 754 (3d Cir. 1987) ................................................66

*United States v. Marx,*
  635 F.2d 436 (5th Cir. 1981) ................................................60

*United States v. Mechanik,*
  475 U.S. 66 (1986) ..............................................................65

*United States v. Mercado,*
   610 F.3d 841 (3d Cir. 2010) .................................................22

*United States v. Pearlstein,*
   576 F.2d 531 (3d Cir. 1978) .................................................23

*United States v. Quiles,*
   618 F.3d 383 (3d Cir. 2010) ..................................................2

*United States v. Riddick,*
   156 F.3d 505 (3d Cir. 1998) ..................................................3

*United States v. Rinaldi,*
   301 F.2d 576 (2d Cir. 1962) .................................................55

*United States v. Self,*
   681 F.3d 190 (3d Cir. 2012) .................................................56

*United States v. Silveus,*
   542 F.3d 993 (3d Cir. 2008) ..................................................3

*United States v. Starnes,*
   583 F.3d 196 (3d Cir. 2009) .................................................22

*United States v. Tomlinson,*
   2 Fed. App'x 104 (2d Cir. 2001) ...........................................55

*United States v. Vazquez,*
   271 F.3d 93 (3d Cir. 2001) ...................................................2

*United States v. Wright,*
   665 F.3d 560 (3d Cir. 2012) .................................................23

## **STATUTES**

18 U.S.C. § 152(3) ...............................................................4, 13

18 U.S.C. § 157(1) ...............................................................4, 13

18 U.S.C. § 1343 ............................................................... 4, 13

18 U.S.C. § 1344 ...............................................................4, 13

18 U.S.C. § 3231 ..................................................................1

28 U.S.C. § 1291 ..................................................................1

28 U.S.C. § 3742(a) ...............................................................1

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The United States District Court for the Middle District of Pennsylvania had subject matter jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 3742(a).

The district court entered its judgment of conviction and sentence in this case on November 16, 2015. App. 32A. Harley filed a notice of appeal on February 8, 2016. App. 60A.

## STATEMENT OF THE ISSUES AND THE STANDARDS OF REVIEW

I.     Whether the evidence introduced at trial was sufficient to support the jury's finding of guilt as to each of the 23 charges leveled against Harley.

When reviewing challenges to the sufficiency of the evidence in criminal trials, this Court considers the evidence in the light most favorable to the government, and will uphold the conviction if any rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424 (3d Cir. 2013).

II.    Whether the district court plainly erred in refusing to order a new trial after a single inadvertent reference to a prior criminal matter involving Harley was temporarily available to the jury.

This Court generally reviews a district court's denial of a motion for new trial for abuse of discretion. *United States v. Quiles*, 618 F.3d 383, 390 (3d Cir. 2010). Where, however, an issue is not first raised before the district court, however, the plain error standard applies, and that standard requires (1) an error; (2) that is plain; and (3) that affects substantial rights . *United States v. Vazquez*, 271 F.3d 93, 99 (3d Cir. 2001). If all three elements are present, then this Court may correct the

error, but only if it seriously affects the fairness, integrity or public reputation of judicial proceedings. *Id.*

III.   Whether the district court erred in denying Harley's motion to suppress evidence discovered during the search of his home, when the evidence showed that a valid warrant had been issued for the search.

This Court reviews a district court's denial of a motion to suppress evidence for clear error as to the underlying facts, but exercises plenary review as to the legal issues in light of properly found facts. *United States v. Silveus*, 542 F.3d 993, 999 (3d Cir. 2008) (quoting *United States v. Riddick*, 156 F.3d 505, 509 (3d Cir. 1998)).

IV.   Whether the district court erred in denying Harley's motion to dismiss the indictment where he claimed that the United States offered perjured testimony in the grand jury proceedings that was allegedly "inconsistent" with evidence introduced at trial.

When reviewing a motion to dismiss an indictment, this Court's standard of review is mixed, employing plenary review over a district court's legal conclusions, and reviewing challenges to findings of fact for clear error. *United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011).

## STATEMENT OF THE CASE

*A. Procedural History*

On August 30, 2012, the appellant in this case, Richard Harley, was named as a defendant in a 23-count indictment issued by a grand jury seated in the United States District Court for the Middle District of Pennsylvania. App. 1A. In this indictment, Harley was charged with 15 counts of wire fraud in violation of 18 U.S.C. § 1343; two counts of bankruptcy fraud in violation of 18 U.S.C. § 157(1); five counts of making false statements in relation to a bankruptcy proceeding in violation of 18 U.S.C. § 152(3); and one count of bank fraud in violation of 18 U.S.C. § 1344. *Id.*

On September 16, 2013, Harley filed a pre-trial motion to suppress all evidence discovered during a search of his home. *Motion to Suppress*, Rec. Doc. No. 40.[1] Ultimately, the district court denied this motion. App. 23A.

Harley's jury trial commenced on December 3, 2014, and concluded almost two weeks later on December 15, 2014. At the

---

[1] For documents contained in the district court record but not included in the joint appendix, the cite form "Rec. Doc. No." followed by the docket number and any relevant pages/exhibit numbers will be used.

4

conclusion of this trial, Harley was found guilty on all counts. Rec. Doc. No. 164. Following his trial, Harley moved for a judgment of acquittal and new trial, but this motion was ultimately denied. *Motion*, 28A & *Memorandum*, 40A.

Following the preparation of a Pre-Sentencing Report and sentencing hearing, Harley was sentenced to, among other things, 144 months in prison as to counts 1-15 and 23, and 60 months in prison on counts 18-22 – all to run concurrently. *Judgment*, App. 32A.

This appeal followed.

*B. Statement of the Facts*

1. <u>Harley's Past Judgments Against Him</u>.[2]

The instant case is not the first time that Richard Harley has come into contact with federal law enforcement authorities as a result of fraudulent conduct. In November of 1996, Harley was named as a defendant in a criminal indictment arising out of his scheme to defraud patients and investors through promotion of an untested ozone enema

---

[2]    The existence of these past judgments against Harley is a key aspect of some of the false statements and bankruptcy fraud issues in this case, and thus their existence is relevant for the purposes of this appeal.

therapy. PSR ¶ 6; *United States v. Harley*, MDPA No. 3:CR-96-286.
After a jury trial he was convicted and sentenced to, among other
things, five years in prison. *Id.*

In addition to the above, the Securities and Exchange Commission
also filed a civil lawsuit against Harley based on the same ozone enema
scheme. PSR ¶ 5. The SEC ultimately obtained a final judgment against
Harley in the amount of $1.4 million. *Id.*; *SEC v. Harley*, 294 Fed. App'x
711 (3d Cir. 2008).

Finally, in 2009, one of the victims of Harley's fraud filed a civil
lawsuit against him and his company in Lehigh County Court. PSR ¶ 7;
*Silverstein v. Harley*, et al., 2009-C-5910 (Ct. Com. Pl. Lehigh Cty.,
2009). In 2011 this case resulted in a $1.1 million judgment against
Harley. *Id.*

2. The Instant Offense Conduct.

As Harley was convicted of 23 separate counts arising under a
variety of statutes and involving various separate sets of facts
depending on the particular fraudulent scheme at issue, the following
statement of facts as to the offense conduct will focus on the various

schemes, and not seek to proceed by listing the facts underlying each individual count.

### a. Harley's Texas Oil Scheme

In September of 2011, one of Harley's victims, Marshall Silverstein, contacted federal law enforcement authorities and accused Harley of defrauding him of over $250,000. PSR ¶ 8. As part of his accusations, Silverstein alleged that Harley had claimed that his company, RJH and Company, Inc. owned 10 million barrels of oil in Texas worth over $1 billion. *Id.* In support of this claim, Harley had showed Silverstein a variety of fraudulent documents including a $200 million "oil production note" from an "Enpetro LPC, Inc."; an "Assignment of Collateral" purportedly issued by Enpetro to RJH and Company; and a "certified" geological report authored by a petroleum geologist estimating the value of this collateral. *Id.* Based upon Harley's claims and the production of these documents (and others discussed below in connection with Harley's fraudulent Federal Reserve Note scheme) Silverstein made a series of loans to Harley between 2006 and 2009 under the protection of what Harley claimed were "secured promissory notes". *Id.* By 2009 Silverstein had provided Harley with

almost $260,000 and was owed roughly $2 million under the terms of Harley's promissory notes. *Id*.

Between the Texas Oil scheme and the Federal Reserve Note scheme discussed below, Harley transmitted or caused to be transmitted through wire transfers payments, writings, signs and/or pictures on at least fifteen occasions, leading (among other things) to counts 1-15 in the indictment. PSR ¶ 11.

### b. *Harley's Federal Reserve Note Scheme*

In addition to the Texas Oil scheme discussed above, Harley also actively engaged in fraudulent conduct by claiming that he had "unrestricted bond power" over billions of dollars of Federal Reserve instruments held at the Federal Reserve Bank in New York City. PSR ¶ 8. To "prove" his claims, Harley showed to Silverstein and others documents purportedly signed by then Federal Reserve Chairman Ben Bernanke that indicated Harley was entitled to receive billions of dollars in Federal Reserve Instruments on behalf of two individuals named "Yohannes Riyadi" and "Joseph Teo Kiat." *Id*.

As with the Texas Oil scheme, Harley used the above fraudulent documents and claims to induce Silverstein and other victims to loan

him money in exchange for future expected returns well exceeding their loans/investments. PSR ¶ 11-12. In furtherance of this scheme, Harley transmitted or caused to be transmitted through wire transfers payments, writings, signs and/or pictures on at least fifteen occasions, leading (among other things) to counts 1-15 in the indictment. PSR ¶ 11.

At least insofar as his Federal Reserve Note scheme is concerned, Harley did not stop there. Between 2009 and 2011 Harley repeatedly made demands of the Federal Reserve Board in Washington, D.C. and Federal Reserve Banks in Atlanta and New York to send him $1 billion based upon his claim of "unrestricted bond power" and two fraudulent $500 million checks. PSR ¶ 14. Despite warnings that his behavior was potentially criminal, Harley continued to make demands upon the Federal Reserve and continued to provide fraudulent documents in support of his claim, including some bearing the name Ben Benanke and others purported to be "powers of attorney" executed by "Joseph Teo Kiat." *Id*. Not only did the Federal Reserve continue to reject these claims, but officials also directed Harley to the Federal Reserve Bank of

New York website which detailed the type of scam Harley was attempting to execute – including the name of "Yohannes Riyadi". *Id*.

Despite these warnings, from 2009 to 2012 Harley attempted to deposit his two fraudulent $500 million checks with financial institutions in Pennsylvania, California and Massachusetts in order to obtain lines of credit. PSR ¶ 15. All told, Harley's fraudulent communications with his investors, the Federal Reserve and these other financial institutions formed the basis of counts 1 through 15 and 23. PSR ¶¶ 11, 14 – 16.

c. *Harley's Bankruptcy Fraud Scheme*

In November, 2010, Harley filed a bankruptcy petition in the Middle District of Pennsylvania on behalf of RJH and Company. PSR ¶ 17; 5:10-BK-09451. In that petition Harley claimed that his company owned ten million barrels of Texas oil and had assets totaling $765 million. *Id*. As a result of Harley identifying Marshall Silverstein as a creditor, the filing of this bankruptcy petition had the effect of forcing the cancellation of a scheduled sanctions hearing in the civil case Silverstein was pursuing against Harley at the time. *Id*. Ultimately,

this bankruptcy petition was dismissed as Harley never paid the filing fee and did not pursue the petition. *Id.*

Harley would pursue the identical strategy only four months later when he filed a second bankruptcy petition in March of 2011. PSR ¶ 18; 5:11-BK-02060. Once again Harley claimed that his company owned ten million barrels of Texas oil and had assets totaling $765 million. *Id.* Also again, as a result of Harley identifying Silverstein as a creditor, the filing of this bankruptcy petition had the effect of forcing a halt to proceedings in the civil case Silverstein was pursuing against Harley at the time. *Id.* Ultimately, this bankruptcy petition was dismissed by the bankruptcy court for "bad faith." *Id.*

Harley was still not done. In May of 2012 Harley filed a third bankruptcy petition in the Middle District of Pennsylvania on behalf of himself. PSR ¶ 19; 5:12-BK-03201. Notably in this petition Harley omitted numerous salient facts including the fact that Silverstein and the United States were now creditors by virtue of the judgments obtained against him (as detailed at the outset of this factual background), the fact that he was an officer of RJH and Company, and did not report all of the property that he owned. *Id.* Once again, the

11

filing of this bankruptcy petition had the effect of forcing a halt to proceedings in the civil case Silverstein was pursuing against Harley. *Id*. Ultimately, this bankruptcy petition was dismissed. *Id.*

All of the above fraudulent and bad faith conduct served as the basis for charges 16 through 22 of the instant indictment.

### 3. The Investigation.

After Silverstein alerted federal investigators to Harley's actions, FBI agents executed a search warrant at Harley's residence. PSR ¶ 20. Numerous fraudulent oil-related and Federal Reserve Bank documents were seized as well as evidence that Harley had used them to defraud over 50 victims. These documents included some bearing signatures (including that of Ben Bernanke) that were obtained off of the internet and then cut, pasted and copied onto documents in an attempt to give them the air of legitimacy. *Id*.

The investigation also uncovered that Harley's sole source of legitimate income was via Social Security benefits received by he and his wife. PSR ¶ 10. Neither he nor RJH and Company possessed any valuable assets, despite his claims to the contrary. *Id*. In addition the FBI learned that they had previously investigated Harley a decade

before for attempting to use a fraudulent Enpetro $200 million "oil production note" in Alabama in 1999. *Id.*

    4. Harley's Indictment, Trial and Sentencing.

On August 30, 2012, Harley was named as a defendant in a 23-count indictment issued by a grand jury seated in the United States District Court for the Middle District of Pennsylvania. App. 1A. In this indictment, Harley was charged with 15 counts of wire fraud in violation of 18 U.S.C. § 1343; two counts of bankruptcy fraud in violation of 18 U.S.C. § 157(1); five counts of making false statements in relation to a bankruptcy proceeding in violation of 18 U.S.C. § 152(3); and one count of bank fraud in violation of 18 U.S.C. § 1344. *Id.*

On September 16, 2013, Harley filed a pre-trial motion to suppress all evidence discovered during a search of his home. *Motion to Suppress*, Rec. Doc. No. 40. This was based on his claim that he was not provided, at the time of the search, with a signed and/or dated copy of the search warrant. *Memorandum of Law in Support Of Defendant's Motion to Suppress*, Rec. Doc. No. 41. In response, the United States proffered the testimony of the executing agent who asserted that he did show Harley a signed and dated warrant on the date of the search, but

also argued that provision of a signed and dated warrant is not required in any event. *Response of the United States*, Rec. Doc. No. 42 at 10-15. Ultimately, the district court denied this motion. App. 23A.

Harley's jury trial commenced on December 3, 2014, and concluded almost two weeks later on December 15, 2014. At the conclusion of this trial, Harley was found guilty on all counts. Rec. Doc. No. 164.

Following his trial, Harley moved for a judgment of acquittal and new trial on many of the bases included in this appeal, but this motion was ultimately denied. *Motion*, 28A & *Memorandum*, 40A. In rejecting Harley's bid to secure a post-verdict acquittal, the District Court Found the following:

- The evidence supported the jury's conclusion that Harley knew that the Texas oil investment was fraudulent by virtue of the fact that its valuation at over $1 billion was, on its face, incredulous; Harley never attempted to collect on this investment despite being on a very limited income; Harley would not discuss what he had given as consideration for the Enpetro promissory note; Harley lied about the most recent date the Texas oil wells were in operation;  and Harley lied about what he used to victim's money for (i.e. personal expenses instead of the investment) as well as his own education, experience and wealth. App. 44A-45A.

- The evidence supported the jury's conclusion that Harley knew that the Federal Reserve checks were fraudulent by virtue of the fact that the idea that he owned billions or trillions in Federal Reserve instruments was inherently incredulous; Harley was repeatedly told that his documents were fraudulent and part of a well-known fraudulent scheme; and the search of Harley's home uncovered documents showing he was familiar with the type of fraudulent scheme he was attempting to execute, had been told it was fraudulent, and was engaged in the creation of false bank documents in furtherance of the scheme. App. 45A-47A.

- The evidence supported the jury's conclusion that Harley filed his first two bankruptcy petitions in an effort to avoid or delay proceedings in his civil suit involving victim Marshall Silverstein, constituting bankruptcy fraud. App. 48A-49A.

- The evidence supported the jury's conclusion that Harley knowingly and willfully falsified or omitted information with regard to his bankruptcy petitions in that he continued to claim Texas oil assets that he did not possess, neglected to list Silverstein or the United States as creditors after those parties had obtained money judgments against him, and omitted reporting certain assets (including bank accounts) he possessed. App. 49A-50A.

- The inadvertent reference to Harley's prior criminal proceeding through the existence of the unredacted word "criminal" on a single document did not generate unacceptable prejudice or a miscarriage of justice when no objection was made upon the short display of the document, it was redacted as soon as it was discovered and before it was provided to the jury, and the defense declined a curative instruction. App. 52A-53A.

- Even if allegedly false or inconsistent testimony was presented to the grand jury, there was no indication that it caused the grand jury to indict Harley when it otherwise would not have, nor did it impact the trial as the allegedly false or inconsistent testimony was not offered at trial and Harley elected not to call the witnesses he accused of perjury. App. 53A-58A.

Following the preparation of a Pre-Sentencing Report and sentencing hearing, Harley was sentenced to, among other things, 144 months in prison as to counts 1-15 and 23, and 60 months in prison on counts 18-22 – all to run concurrently. *Judgment*, App. 32A.

This appeal followed.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Counsel for the United States is not aware of any case or proceeding, contemplated or pending before this Court or any other court or agency, state or federal, which is in any way related to the instant case.

## SUMMARY OF ARGUMENT.

I.      Harley's claims that the evidence was insufficient to convict

him on any of the 23 charges against him fail. As to each of the charges,

the United States presented voluminous evidence – both testimonial

and documentary – establishing that Harley knowingly and (when

required) willfully engaged in fraudulent schemes designed to bilk his

victims out of their assets. He then engaged in a pattern of bankruptcy

filings that were intended to delay the efforts of a victim to collect on a

judgment against Harley, and knowingly omitted creditors and assets

from a personal bankruptcy filing.

II.     The brief, inadvertent display to the jury of a document

indicating that Harley had a prior criminal docket number did not

require a new trial. There was no evidence the jury even noticed it, the

document was redacted prior to the provision of the document to the

jury for deliberations, and Harley himself declined the delivery of any

curative instruction. Measured against the overwhelming evidence of

Harley's guilt produced at trial, the inadvertent display of the docket

number can only be considered harmless.

III.    The district court did not err in refusing to suppress evidence seized during the August 29, 2012, search of Harley's home. While the issue of whether a signed and dated copy of the warrant was shown and/or provided to Harley at the time was (and is) in dispute, there can be no dispute that a signed, dated and otherwise valid search warrant was issued by a magistrate judge two days prior. As such, even if a signed and dated copy of the warrant was not provided to Harley, this would constitute, at most, a technical violation of the Federal Rules of Criminal Procedure and that is not enough to support the suppression of evidence.

IV.    Harley has failed to provide any basis for a finding that testimony offered by two witnesses in grand jury proceedings which he asserts was "inconsistent" with statements to the FBI twelve years earlier constituted perjury as opposed to resulting from simple confusion, mistake or faulty memory. In any event, even if the testimony was deliberately false, the testimony was not offered at trial, and Harley's conviction by a petit jury on all counts renders any error in the grand jury proceedings harmless beyond a reasonable doubt.

19

## **ARGUMENT**

In seeking to have this Court overturn his conviction on all 23 charges against him, Harley raises four distinct challenges: (1) he argues that, as to each of the 23 counts, the evidence introduced at trial was insufficient to support a jury finding of guilt; (2) he argues that the district court erred in failing to grant him a new trial because of alleged prejudice flowing from a single, inadvertent display of the word "criminal" on a document referencing a prior case; (3) he argues that the district court erred in failing to suppress evidence seized during law enforcement's search of his home; and (4) he argues that the District Court erred in failing to dismiss the indictment based on alleged inconsistent and perjured testimony. Each of these claims will be examined below and shown to lack any merit whatsoever.

I.    The evidence produced at trial was more than sufficient to allow the jury to conclude that Harley was guilty of each of the 23 charges against him.

As noted above, the first category of challenges Harley puts forth with regard to his convictions are various claims that the evidence introduced at trial was insufficient to support a finding of guilt as to each count. *See Harley Br.* at 12-21. While the exact nature of the

20

alleged insufficiencies changes slightly depending on which charges are being discussed, the legal framework that must be applied to each of his claims is the same.

In *United States v. Caraballo-Rodriguez,* 726 F.3d 418 (3d Cir. 2013) (en banc), this Court stated the applicable standard of review when an insufficiency of the evidence claim is raised:

> We have set forth the appropriate standard in a sufficiency of the evidence challenge many times. We "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[ ] beyond a reasonable doubt." *United States v. Brodie,* 403 F.3d 123 at 133 (3d Cir. 2005) (internal quotation marks and citation omitted). Under this particularly deferential standard, we "must be ever vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Id.* Furthermore, "we review the evidence as a whole, not in isolation, and ask whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt." *United States v. Boria,* 592 F.3d 476 at 480 (3d Cir. 2010). We must sustain the jury's verdict "if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." *United States v. Gambone,* 314 F.3d 163, 170 (3d Cir. 2003) (internal quotation marks omitted).

*Caraballo-Rodriguez,* 726 F.3d at 430.

In light of the above, the standard for analyzing sufficiency of the evidence claims is quite stringent and the defendant bears the heavy burden of demonstrating that "the prosecution's failure is clear." *United States v. Leon,* 739 F.2d 885, 891 (3d Cir. 1984) (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)); *United States v. Mercado,* 610 F.3d 841, 845 (3d Cir. 2010). The jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not "fall below the threshold of bare rationality." *Caraballo-Rodriguez*, 726 F.3d at 431 (quoting *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012)).

In cases where the defendant's state of mind is in issue, as is the case here, this highly deferential standard of review still applies, and this Court has repeatedly emphasized that it is not unusual that the government will not have direct evidence of a defendant's state of mind. *Caraballo-Rodriquez*, 726 F.3d at 431. In such cases, circumstantial evidence alone is sufficient to prove a defendant's state of mind. *Id*; *United States v. Iafelice*, 978 F.2d 92, 98 (3d Cir. 1992); *United States v. Starnes*, 583 F.3d 196, 213 (3d Cir. 2009). "Inferring mental state from

circumstantial evidence is among the chief tasks of fact finders."

*United States v. Wright*, 665 F.3d 560, 569 (3d Cir. 2012).

It is also important to note that, despite Harley's claims to the contrary, the only charges that required a showing of willfulness were counts 18 through 22 which charged Harley with making false statements in bankruptcy filings. Devitt, Blackmar, and O'Malley, *Federal Jury Practice and Instructions*, § 24.07 (4th ed. 1990). The *mens rea* for the wire fraud, bankruptcy fraud, and bank fraud charges only required that Harley knowingly devised the fraudulent scheme and acted with the intent to defraud. *See Third Circuit Model Jury Instructions 6.18.1343* (wire fraud); *Mod. Crim. Jury Instr. 9th Cir. 8.11* (2010) (bankruptcy fraud); *Third Circuit Model Jury Instructions 6.18.1344* (bank fraud). Willfulness for fraud offenses is only required if the government contends that the defendant participated in an on-going fraud. Then, the government must show that the defendant willfully participated in the scheme with knowledge of its fraudulent nature. *United States v. Pearlstein*, 576 F.2d 531, 537 (3d Cir. 1978). Here, the

government alleged that Harley devised the schemes, so willfulness was not required.[3]

### A. *There was overwhelming evidence of intent to defraud regarding counts one through fifteen of the indictment.*

Harley's first attempts to argue there was insufficient evidence to convict him pertain to counts one through fifteen and center around his claim that there was insufficient proof as a matter of law that he "knew that the Texas oil investment or the Federal Reserve checks were fraudulent or that he intended to make any misrepresentations to the companies and individuals to whom he presented these investment opportunities." *Harley Br*. at p. 14. This is simply untrue. At trial the government introduced both direct and circumstantial evidence that Harley knew that his claims regarding both the Texas oil investment and the Federal Reserve checks were false.

### (1) The Texas Oil Scheme.

First, with regard to the Texas oil scheme, Harley's claim that he owned over $1 billion of oil located in Texas was absurd on its face.

---

[3]    Indeed, Harley's own requested jury instructions did not mention willfulness as an element of any of the offenses. Rec. Doc. No. 141.

According to Harley's statements to the FBI, he subsisted on $535 per month in Social Security income at the time he claimed to his victims that he was the holder of a valid $200 million corporate promissory note collateralized by valuable oil reserves worth over $1 billion. *Trial Testimony of FBI Special Agent Browning*, App. 1126A-1133A. When Special Agent Browning questioned Harley as to why he didn't call the note due and get his $200 million from the company that supposedly would have paid it – Enpetro – Harley stated he preferred to hold the asset and just try to borrow against its value. App. 1133A. Harley then stated he didn't think Enpetro had the money to pay him, which would supposedly have allowed him to attach the oil that collateralized the note. *Id.* When asked what value Harley gave to Enpetro to get the note in the first place, Harley refused to answer. App. 1132A-1133A.

When the above testimony is combined with the documents found in Harley's house (and introduced into evidence) that show he had been researching prior fraudulent schemes involving the use of bogus assets to collateralize loans and lines of credits (*see, e.g.*, Gov't Ex. 23.10 and 23.8(B) found at App. 2048A and 2210A respectively), a jury could reasonably infer that Harley knew his Texas oil claims were false.

Second, the evidence showed that the FBI found five "original"

$200 million oil promissory notes in Harley's possession. Gov't Ex. 45.1,[4]

and the jury could have reasonably concluded that Harley simply

created these documents rather than providing any consideration in

exchange for the note.

Third, Harley's own witness, oil geologist Donald Kesterson, told

Harley that by the terms of his assignment of collateral, if there was a

default on the promissory note(s), Harley was to be paid monthly from

the production of the wells.[5] *Kesterton Testimony*, App. 1290A-1291A.

Yet, Mr. Kesterson acknowledged that there had been no production on

any of the wells since 1993, and that fact was conveyed to Harley in his

report. In response, Harley lied to Kesterson claiming the wells were in

production as of 1999. App. 1316A-1317A. From this testimony the

---

[4]     Undersigned counsel was unable to locate where this exhibit
was included in Harley's Appendix. That being said, it should be
undisputed that these alleged "promissory notes" were entered into
evidence. *See Trial Exhibit Sheet*, Rec. Doc. No. 167.

[5]     Kesterson conceded he never did a title search of the six
leases he issued his report on and had never inspected the wells. He
acknowledged that he didn't know whether Enpetro owned the leases,
whether the leases were expired, what the drilling depth rights of the
leases were, and most importantly, whether any of the six leases were
the collateral listed in the note and assignment of collateral. *Kesterton
Testimony*, App. 1269A-1279A.

jury could have reasonably inferred that Harley knew the collateral was worthless, even assuming Enpetro owned the leases and assuming they were not expired of sufficient drilling rights, because no oil had been produced on any of the wells for years prior to his scheme and the wells were incapable of producing marketable oil. The jury could have also reasonably inferred that the fact Harley lied to Kesterson claiming that the wells were in production in 1999 when they were not, indicated that he knew the collateral was worthless. The jury could have also reasonably inferred that Harley acted with the intent to defraud his victims when he repeatedly claimed that he needed their money so he could extract the oil and sell it because Kesterson told him that he had no rights to the oil once it was removed from the ground. App. 1336A.

Harley's only attempts to undermine this evidence consist of his assertions that he didn't always value the oil at $1 billion, he had reasons for not cashing in the note, and that Kesterton did not rely on his claim that the oil wells were still producing in 1999. *Harley Br.* at 15-16. These arguments do nothing to help him. First, even the lowest valued of the oil he claims to have received – $250 million – is absurdly high considering Harley has never indicated what consideration he paid

to obtain the rights to it. Second, while he may have indicated supposed

reasons for choosing not to "cash in" and instead to live on very limited

Social Security benefits, the jury was free to reject such an explanation.

Finally, the fact that Kesterton may not have relied on Harley's false

claims as to when the oil wells in question were last active is irrelevant

and does nothing to change the fact that Harley lied about this fact in

furtherance of his fraudulent scheme. In short, the government offered

more than sufficient evidence that Harley knew his Texas oil scheme

was fraudulent and thus the jury reaching such a conclusion was

reasonable.

(2)     The Federal Reserve Scheme.

Turning to the Federal Reserve scheme, various Federal Reserve

Bank officials testified that they personally communicated with Harley

on numerous occasions and informed him that the Treasury checks and

associated documents he claimed to be valid were, in fact, bogus and

part of a well-known scheme to defraud the Federal Reserve Bank. *See,

e.g.*, *Testimony of Richard Jones*, App. 154A, 198A-199A, 205A-206A;

*Testimony of Leonard Zawistowski*, App. 286A-288A; *Testimony of Sahil

Godiwala*, App. 300A-309A. In one conversation, Harley was even told

it was a federal crime to attempt to negotiate these bogus checks. App. 305A. The earliest of these conversations occurred in December 2009. App. 275A. Harley continued to make false representations about the legitimacy of the checks and associated documents well after those conversations, however. *See, e.g.*, *Indictment*, App 1A *et seq.* at Count 11—May 4, 2010; Count 13—April 3, 2012; Count 15—April 18, 2011. In light of the above, the government offered direct evidence of Harley's state of mind with respect to the Treasury check scheme.

Besides the direct evidence of Harley's state of mind, there was overwhelming circumstantial evidence of his guilty state of mind with respect to the Federal Reserve scheme. At the outset, it must be noted that Harley's claims of owning billions (or even trillions) of dollars of Federal Reserve instruments was patently absurd. Why some wealthy individuals named "Yohannes Riyadi" and "Joseph Teo Kiat" would have received such an extraordinary amount of money from the Federal Reserve Bank and why they would have agreed to give Harley "unrestricted bond power" over the funds has never been explained and defies common sense.

Second, Special Agent Browning testified that he found numerous incriminating documents in Harley's residence and on his computer as a result of a search conducted on August 29, 2012. These included Government exhibit 23.8(B) (found at App. 2210A) which was a printout of a warning from the Federal Reserve Bank of New York website titled "Scam Involving Yohannes Riyadi and/or Wilfredo Saurin November 2007." The printout warned the public of the fraudulent nature of the very type of documents that were at the heart of Harley's scheme, and describe a scheme virtually identical to the one Harley was engaged in, i.e., attempting to use fraudulent documentation as collateral for lines of credit or other types of asset-based financing.

The search also uncovered Government exhibit 23.9, found at App. 2212A, which was Harley's own characterization of the conversation he had with Richard Jones where Jones told him his documents were all bogus.

Other incriminating documents found during the search indicated that Harley actually created the fraudulent Federal Reserve documents. For example, government exhibit 23.15, found at App. 2118A, was a printout of an email from Harley to "josefteo@gmail.com" dated April

30

30, 2009, titled "verbiage." The email requests that "Joseph" write a letter on bank letterhead claiming the Treasury checks are valid. Attached were copies of the bogus "to whom it may concern" letters on what purported to be Federal Reserve Bank letterhead dated May 4, 2009, claiming the Treasury checks were valid. One version had a typed signature for Ben S. Bernanke, the other a signed version.

Government exhibits 23.16, 17, 18, and 19, found at App. 2120A-2141A, were all images of signatures of various individuals, including Ben S. Bernanke, the former Chairman of the Federal Reserve System, Mr. Kiat, and Mr. Riyadi.

Government Exhibit 23.21, found at App. 2156A-2164A, was a copy of Yohannes Riyadi's Indonesian passport, blank letterhead titled "Yohannes Riyadi," and various documents purportedly signed by Riyadi appointing Harley his power of attorney.

Finally, for the purposes of this argument, government exhibit 23.10, found at App. 2048A, was a printout of a press release from the United States Attorney's Office for the District of Nevada titled "Men Charged With Providing Phony Million Dollar Bills to Local Bank as Collateral For Loan."

From all of the above testimony and documentary evidence, it is clear that a jury could reasonably conclude that Harley not only knew that his documents were fraudulent, but was actively engaged in forging documents in furtherance of his scheme and knew that his actions were illegal.

Harley's only attempt to counter the weight of this evidence is the assertion that two bank witnesses testified at trial that they thought Harley believed that the Federal Reserve documents he was attempting to use were genuine. *Harley Br.* at 14. That may very well be – but it only demonstrates that Harley had the capacity to sound sincere. Moreover, neither of those bank witnesses had, at the time of their conversations, the benefit of reviewing all of the other evidence – including the documentation described above – that the jury was provided with at trial. When the entirety of the evidence is viewed in the light most favorable to the government, there can be little doubt that a jury could reasonably conclude that Harley knew he was perpetrating a fraud.

(3)    Other Fraudulent Behavior Toward His Victims.

In addition to the above evidence, the government produced other evidence showing that Harley intended to defraud his victims. For example, he lied that he needed their money for various business-related purposes, but in reality, used it for everyday living expenses and luxury automobiles. He lied about his education and wealth, claiming to have a Ph.D., that he had discovered a cure for AIDS, and that he owned artwork valued at millions of dollars. He promised exorbitant returns on his "secured corporate promissory demand notes," and then failed to return any of the principle or any of the promised interest, making wildly false claims to justify the failure to pay the victims.

The specific instances of such conduct are telling. First take Mary Ann Alexander, who was born blind. Harley told her that his oil investment opportunity was just being offered to a few people who he thought needed it the most, when, in fact, he trolled the internet constantly for unsuspecting victims. *Testimony of Mary Ann Alexander*, App. 431A. As a result, Ms. Alexander borrowed money from her home equity line of credit and took money from her daughter's college education fund because Harley promised a 500 percent return on her

money in thirty days.  App. 432-433A.  Despite asking repeatedly for her money back over the course of twenty-six months, she finally gave up because she couldn't afford to hire a lawyer.  App. 437A-438A.

Harley told Peter Blau that he represented a group of wealthy Indonesians who owned Federal Reserve notes worth $40 billion and requested Blau recruit investors to buy the notes. *Testimony of Peter Blau*, App. 454A.  Harley also told him that he owned oil and gas reserves worth a huge amount of money and wanted Mr. Blau to recruit people to loan Harley money based on his oil reserves.  App 455A.  Harley then successfully solicited $5,000 from Mr. Blau promising to give him $1 million in four months in return.  App. 460A.  The $5,000 was supposedly needed by Harley to pay a certain expense in order to be able to have the Federal Reserve notes free and clear of any encumbrances.  App 461A.  After repeatedly asking for his money, Mr. Blau finally gave up in 2012 or 2013.  App. 464A.

Kathleen Kelly was a close friend of Harley's wife who received a $40,000 Social Security disability payment for a brain aneurysm and psychological issues. *Testimony of Kathleen Kelly*, App. 484A-485A.  In inducing Ms. Kelly to give him money, Harley told her he could triple

her money in six months because he was going to sell his vast reserves of oil and that he was offering the opportunity because they were such good friends. App. 486A-487A. After failing to return her money, Harley made various excuses why he couldn't pay her back and Ms. Kelly eventually contacted a lawyer, but didn't have the money to pursue the matter. App. 493A.

Marshall Silverstein, an 83-year old man with significant medical problems, lost $259,500 as a result of Harley's lies. *Testimony of Marshall Silverstein*, App. 528A; Gov't Ex. 42.1, found at App. 2823A-2824A. Harley told Mr. Silverstein he owned vast oil reserves in Texas worth billions of dollars, $1 billion in government Treasury checks, and artwork worth over $1 million. App. 532A-533A. Harley told Mr. Silverstein he needed money to get his oil out of the ground and sell it, and promised Mr. Silverstein he could triple or quadruple his money in a short time. App. 534A-535A, 552A. Harley also promised to make a $500,000 donation to Mr. Silverstein's synagogue and extend it a loan of up to $1.5 million. App. 539A. Over a three-year period from 2006 through 2009, based on these lies, Mr. Silverstein invested $259,500 with Harley and was promised $2 million in return. App. 2823A. When

35

he never received any of the promised returns, Silverstein sued Harley, obtained a civil judgment, and his lawyer referred the matter to law enforcement. App. 506A-508A, 541A. After Harley filed three successive bankruptcy actions to stall Mr. Silverstein's lawsuit, he was able to collect $40,000 from the sale of a Lexus automobile Harley purchased with Silverstein's money. App. 517A.

Bertrand Falls invested his money with Harley based, in part, on Harley's false claims that he was a minister, was a doctor, and had discovered a cure for AIDS. *Testimony of Bertrand Falls*, App. 620A. Harley claimed he had amassed vast wealth through his ministry and business contacts, including oil and gas contracts, deposits with the Federal Reserve, and valuable artwork. App. 621A. He also claimed to own a Bentley or a Rolls Royce. App. 624A. Harley told Mr. Falls he would make him a wealthy man by "assigning the contract with the checks." App. 626A. Mr. Falls was going to use the two $500 million checks to get a credit line and pay Harley once the credit line was opened. App. 627A. For the privilege of using Harley's checks, Mr. Falls paid Harley $5,000 as an "origination fee." App. 628A. When Mr. Falls could not gain a line of credit using Harley's bogus checks, Harley

demanded $100 million from him and threatened to sue him.  App. 632A-633A; 649A-650A.

Maurice Schufford lost $10,000 based on Harley's false claim of owning an oil field.  *Testimony of Maurice Schufford*, App. 669A. Harley told Mr. Schufford he needed his money to "reopen" the oil fields, sell the oil and double his money in 45 to 60 days.  App. 669A-670A, 672A.  Based on these false claims, Mr. Schufford, borrowed $10,000 from his mother and wired it to Harley.  App. 672A-673A.  All Mr. Schufford ever received from Harley after that were excuses, as he "never received a dime."  App. 677A.

Malcolm Casselle lost $10,000 based on Harley's false claim of owning a "voluminous oil asset that had been unrealized."  *Testimony of Malcolm Casselle*, App. 688A, 691A.  Harley claimed to own the oil because it collateralized a note that had defaulted.  App. 688A-689A.  In this instance, Harley proposed a joint venture where after Mr. Casselle provided funds to Harley, Harley would assign the oil to Mr. Casselle and Mr. Casselle would obtain financing based upon it.  App. 689A. After giving Harley the $10,000, Mr. Casselle eventually realized the oil assets were bogus and dropped out of the deal.  App. 696A-697A.  This

did not discourage Harley, however, as he continued to solicit money from Mr. Casselle based on false claims of owning valuable Federal Reserve notes and plans to use them as collateral for an "insurance wrap." App. 697A-698A. Thankfully, Mr. Casselle determined that the Federal Reserve notes were bogus and didn't invest any more money. App. 698A.

Peter Bunche lost $21,000 as a result of looking for someone to finance his film company and being introduced to Harley. *Testimony of Peter Bunche*, App. 756A-757A. Harley told Mr. Bunche that he owned nearly a billion dollars of oil in Texas and proposed that Mr. Bunche use his assets to obtain the financing. App. 763A-764A. For the privilege of using Harley's assets, Mr. Bunche simply had to pay Harley. App. 764A. To do so, Mr. Bunche borrowed the money from family and friends, wired it to Harley, and soon realized he was unable to obtain financing using the oil assets. App. 766A. Harley then demanded Mr. Bunche pay him hundreds of thousands of dollars. App. 768A. Finally, Mr. Bunche realized he had been scammed and refused to pay Harley any more money. App. 771A-772A.

Lastly, Irene Randall was solicited by Harley to invest $500,000 based on false claims of owning $1 billion of oil in Texas and "billions" in federal bonds or securities. *Testimony of Irene Randall*, App. 916A-917A. Harley found Ms. Randall because she had previously lost $500,000 in a financial scam and had listed her contact information on a website called ripoff.com where investors report fraudsters. App. 914A. According to Harley, he needed Randall's money to qualify her for an "international trading platform" and promised Randall that she would earn ten times the amount of her principle within months. App. 917A, 922A. As part of the sales pitch, Harley emailed an RJH and Co. corporate profile which stated that RJH owned ten million barrels of oil in Texas with a value in excess of $1 billion and "investment grade debt instruments valued in excess of $1 billion." Gov't Ex. 11, found at App. 1616A. In addition, Harley claimed that as of April 2009, RJH had "unrestricted bond power over valuable bank instruments totaling more than $700 billion." *Id*. Ms. Randall, who had lost $500,000 in a prior scam, didn't have the money Harley required so she didn't invest. App. 926A.

The above pattern of dealings with these victims, when combined with the evidence described in previous discussion sections overwhelmingly support the jury's finding that Harley was not simply a man seeking to capitalize on documents and assets that he believed were legitimate, but instead was a con man, sham artist, predator and criminal who knew exactly what he was doing as he attempted to rip-off victim after victim. As such, any claim Harley might make that he did not "knowingly" commit the crimes for which he was convicted in counts one through fifteen of his indictment lack any merit whatsoever and his convictions on those counts should be affirmed.

### B. There was overwhelming evidence of intent to defraud regarding count 23 of the indictment.

Harley next challenges the sufficiency of the evidence with regard to his conviction of bank fraud in count 23 of his indictment. *Harley Br.* at 17-18. Once again, Harley asserts that this charge was based on his attempts to use two fraudulent $500 million Federal Reserve Checks, and that the evidence was insufficient to prove that he knew they were bogus. *Id.* As was detailed in the previous argument sub-section beginning at page 27, above, there was overwhelming evidence that Harley knew that the Federal Reserve checks were bogus. This Court is

referred to the above discussion of that evidence as the government's

response to Harley's claims as to the sufficiency of the evidence on count

23.

> C. *There was overwhelming evidence that Harley devised a scheme to engage in bankruptcy fraud in order to avoid having to pay any money judgment to one of his victims.*

Counts 16 and 17 charged Harley with bankruptcy fraud based on

two corporate bankruptcy petitions he filed on behalf of RJH and Co.,

which was the debtor on $2 million of secured corporate promissory

notes issued to one of his many victims – Mr. Marshall Silverstein.

Harley claims on appeal that there was insufficient evidence to prove

that the filings constituted a scheme to defraud Mr. Silverstein. *Harley*

*Br.* at 18-20. The United States disagrees.

Upon review of his brief Harley's only argument is that RJH and

Company was in substantial debt and therefore had a "constitutional

and statutory right" to file a bankruptcy petition. *Harley Br.* at 19.

Such an argument misses the mark, however. Whether or not RJH and

Company was entitled to file a bankruptcy petition is immaterial to the

question of whether the petitions were filed with the intent to defraud

Mr. Silverstein.

At trial Mr. Silverstein's lawyer, Kevin Fogerty, testified in great detail how the two bankruptcy petitions filed by Harley greatly impeded Fogerty's ability to litigate claims against Harley.  Mr. Fogerty testified that he filed the civil complaint against Harley and RJH in November of 2009, and didn't obtain a judgment until August 2011. *Testimony of Kevin Fogerty*, App.  514A. He stated the primary reason for the delay was Harley's bankruptcy filings on behalf of RJH where he listed Mr. Silverstein as a creditor, thus triggering delays in the lawsuit. App. 514A-515A.

Specifically, Harley's November 22, 2010, bankruptcy petition was filed immediately prior to a pretrial conference scheduled for December 14, 2010, where Mr. Fogerty was seeking sanctions against Harley and entry of a judgment for Harley's refusal to appear for depositions.  App. 517A.  The pretrial conference was cancelled when Mr. Fogerty and the Court were notified the day before the hearing that the petition was filed due to the automatic stay provision of the bankruptcy code.  App. 518A.

The records of the bankruptcy court, as testified to by a representative of the United States Trustee's Office, showed that

Harley never pursued the petition after it was filed. *Testimony of*
*Gregory Schiller*, App. 936A. Rather, it was dismissed on December 28,
2010, for failure to pay the filing fee. *Id.*

A similar story unfolded only a few months later. Mr. Fogarty
testified that Harley filed a *second* bankruptcy petition for RJH on
March 24, 2011, the day before a hearing was scheduled on the same
issues that were to be litigated on December 14, 2010. App. 520A-521A.
Due to the second bankruptcy petition, the rescheduled hearing was,
again, cancelled. App. 521A.

Mr. Fogerty and the U.S. Trustee both filed motions to dismiss the
second bankruptcy petition for "bad faith." App. 520A, 938A. As a
result, the Bankruptcy Court held a hearing at which Harley testified
under oath. App. 521A-522A. During his testimony, Harley admitted
that one of the reasons he filed the second bankruptcy petition was to
prevent the hearing on March 25, 2011. App. 522A. At the conclusion
of the hearing, the bankruptcy court found that Harley acted in "bad
faith", dismissed the petition, and entered a 180-day bar against Harley
filing another bankruptcy petition on behalf of RJH. *App. 141; 973A;*
and Gov't Ex. 17.9, found at App. 1931A.

It is also relevant to note that Harley filed a third petition in the
bankruptcy court on May 29, 2012, this one a personal bankruptcy
petition. Tr. 12/05/14, p. 142. At the time this petition was filed, Mr.
Silverstein had already obtained a judgment in the state court against
RJH and Harley, personally. App. 524A. At the time Mr. Fogerty was
attempting to collect on the judgment by seizing assets belonging to
Harley and the corporation. The third bankruptcy petition "stopped
everything" except for collection efforts of assets titled to RJH. App.
525A. At the time, Mr. Fogerty was trying to get the sheriff to go into
Harley's home and levy against all assets owned by him personally. *Id*.
The third bankruptcy petition prevented that. On October 12, 2012,
that petition was dismissed for failure to pay the filing fee. App. 527A.

Looking at the totality of the above testimony and documentary
evidence, there was more than sufficient evidence for a reasonable juror
to conclude that, by filing the 2010 and 2011 bankruptcy petitions,
Harley intended to use the bankruptcy code and the protections it
provides to further his scheme to defraud Mr. Silverstein of money to
which Mr. Silverstein was entitled, all as was alleged in counts 16 and

44

17 of the indictment. As such, this Court should affirm Harley's
convictions on both of those counts.

### D. There was overwhelming evidence that Harley knowingly and willfully made material false declarations on his three bankruptcy petitions.

As his next argument on appeal, Harley simply claims that
although "there were some mistakes made in the information provided
on the bankruptcy petitions . . . the record, however, contains no
evidence that the mistakes were knowingly or fraudulently made."
*Harley Br.* at 20-21. This conclusory argument is not supported by the
record.

With respect to the 2010 bankruptcy petition (which was the basis
of count 18 of the indictment), Harley falsely stated in that petition that
RJH and Company had assets totaling $765 million, including ten
million barrels of proven reserves valued at $700 million. *See* Gov't Ex.
16.1 found at App. 1855A. This was no simple mistake – it was a
continuation of the fraudulent claims addressed in detail above. Based
upon the same evidence discussed above with regard to Harley's
fraudulent Texas oil scheme, a reasonable juror could conclude that
Harley well knew that these supposed "oil assets" were worthless, and

that his inclusion of those assets in his 2010 bankruptcy petition amounted to a materially false declaration.

The same argument applies to the 2011 bankruptcy petition (and the basis for count 19 in the indictment) which again saw Harley claiming that RJH and Company had assets totaling $765 million, including ten million barrels of proven reserves valued at $700 million. *See* Gov't Ex. 17.2 found at 1893A. Once again, viewed in the light most favorable to the government, there was more than sufficient evidence to conclude that this statement was no mistake, but rather made knowingly and willfully.

The final three counts of conviction involve Harley's knowing and willful making of materially false statements pertaining to his 2012 personal bankruptcy petition. With respect to the first of these three counts, count 20, Harley's 2012 personal bankruptcy petition failed to list any of Mr. Silverstein, the SEC, or the United States as creditors, despite the fact that all had secured judgments against him. *Testimony of Gregory Schiller*, App. 983A-984A; Gov't Ex. 20.7 found at App. 2038A. At trial the evidence showed that Harley was well aware of these judgments, particularly the Silverstein judgment which had just

46

recently been entered against him personally on August 11, 2011, and

was the ongoing subject of collection efforts by Mr. Fogerty at the time

the petition was filed. Indeed, as was discussed in more detail in the

previous argument sub-section, Harley was filing bankruptcy petitions

to frustrate collection of the Silverstein judgment in the years prior to

his filing of the 2012 personal bankruptcy petition. In addition, Harley

himself listed Silverstein as a creditor of RJH and Company in his 2011

petition, so there can be no doubt that he realized Silverstein was owed

over $1 million by virtue of the judgment against him in Lehigh County.

*See* App. 1899A

Similarly, witness Karen Muslowski testified at trial that the

United States had a judgment against Harley for $168,802 as of March

30, 2001.[6] *Testimony of Karen Muslowski*, App. 817A-818A. As of July

26, 2012, the balance owed was $167,855.74. *Id.* Ms. Muslowski

testified that Harley was repeatedly notified about this debt, including

the filing of lien documents in March of 2009 with the Monroe County

---

[6] The judgment was based on a restitution order in a prior
criminal case where Harley was convicted of involving defrauding AIDS
patients. *See United States v. Harley*, 3:CR-96-286-01, DDE 558, *aff'd*,
*United States v. Harley*, 39 Fed. App'x 789 (3d Cir. 2002).

Court of Common Pleas, and with two collection letters in May and August of 2011. App. 821A-825A. From this evidence a reasonable juror could conclude that Harley's omission of the debt was knowing and willful and not a simple mistake.

Finally as to this count, it is undisputed that, prior to the 2012 bankruptcy petition, the SEC had secured a judgment against Harley in the amount of $1.4 million.[7] Pursuant to a stipulation, a copy of the SEC's judgment (Gov't Ex. 20.5A found at App. 2007A) was read into the record. App. 825A-827A. That judgment was dated January 4, 2008. *Id.* Also read into evidence was a letter from the SEC reminding Harley of that debt dated October 25, 2010. App. 828A-App. 829A; Gov't Ex. 20.5C found at App. 2012A.

Based on the above evidence entered at trial, the jury could have reasonably concluded that Harley's omission of these three judgments was knowing and willful and not a simple mistake.

---

[7] The SEC judgment was the result of a securities fraud lawsuit connected to Harley's operation of an AIDS clinic in the Poconos between 1989 and 1996 and his solicitation of investments from the public alleging that his ozone/enema treatment was a clinically tested, patented procedure that cures AIDS. *See SEC v. Lazare Industries, Inc., et al.*, 3:CV-96-0705, Docket No. 121, *aff'd*, *SEC v. Lazare Industries, Inc.*, 294 Fed. App'x 711 (3d Cir. 2008).

Turning to count 21 of the indictment, Harley was again alleged to have made other false statements in his 2012 personal bankruptcy petition.  Specifically, that he failed to disclose that he was an officer of RJH and Company.  *Testimony of Gregory Schiller*, App. 985A-986A; Gov't Ex. 20.1 found at App. 1947A-1948A.  Overwhelming evidence was presented at trial that Harley repeatedly told his victims he was the CEO of RJH and Company, and signed all of his correspondence using that title – including throughout RJH and Company's prior corporate bankruptcy petitions discussed above.  Given this evidence, the United States submits there was more than sufficient basis for the jury to reasonably conclude that Harley knowingly and willfully omitted his corporate role in RJH and Company when he filed his 2012 personal bankruptcy petition.

Finally, count 22 of the indictment alleged that Harley made additional false statements in his 2012 personal bankruptcy petition in that he failed to list all personal property owned by him and his wife, including art objects.  The petition, in fact, failed to list *any* personal property in Schedule B except a checking account at FNCB with a value

49

of $3.00, and Harley's clothes, watch, wedding band, and chain.[8] *See*

Gov't Ex. 20.3 found at 1971A; *Testimony of Gregory Schiller*, App.

989A. In doing so Harley failed to list bank accounts he controlled at

Merrill Lynch, Penn Security, and Wachovia (Gov't Exs. 26.2A, B, and C

found at App. 2235A-2302A) where most of the victims' money ended up

going, luxury vehicles he purchased with the victims' money, as well as

the $1.8 million in valuable art he claimed to own. Interestingly, he

also failed to list any government or corporate bonds worth billions of

dollars and over which he claimed to have "unrestricted bond power" –

despite the fact he argues to this Court that he honestly believed he

owned such instruments.

Once again, as with the prior counts regarding false statements,

the government submits that there was more than sufficient evidence

for the jury to conclude that Harley knowingly and willfully omitted

---

[8]    On Schedule C, Harley claimed some personal property was
exempt, including his townhome, which he valued at $70,000,
"personal," no value, and "car" at $1,800. As Mr. Fogerty testified, the
2008 Lexus was valued at $40,000 and titled in the name of RJH.
*Testimony of Kevin Fogerty*, App. 511A-514A. *See* Gov't Ex. 20.3 found
at App. 1971A.

this information from his personal bankruptcy petition, and thus any claim Harley might make to the contrary must be rejected.

   *E. Summary.*

   Each of Harley's first four challenges on appeal go to the sufficiency of the evidence presented against him at trial in four categories of charges that he faced. As detailed above, when viewed in the light most favorable to the government, there can be little doubt that a jury could reasonably find the evidence was sufficient to support a conviction on each charge. At best Harley has put forth conclusory statements that the evidence might have supported different conclusions – that is not enough. As this Court has previously stated, Harley was required demonstrate that, in offering evidence, "the prosecution's failure is clear" and that any verdict fell "below the threshold of bare rationality." *See Leon,* 739 F.2d at 891 and *Caraballo-Rodriguez,* 726 F.3d at 431. In light of all of the evidence discussed above, Harley has completely failed to meet that burden.

II.    The district court did not commit plain error when it refused to order a new trial after a single inadvertent reference to a prior criminal matter involving Harley was temporarily available to the jury.

As his next argument in this appeal, Harley argues that evidence briefly available to the jury was "so prejudicial" that a new trial was warranted. *Harley Br.* at 22. An examination of the exact evidence at issue and the circumstances surrounding its inadvertent and temporary availability to the jury makes clear that this argument lacks any merit.

During the testimony of Karen Muslowski on December 9, 2014, Gov't Ex. 20.6(E), which is a copy of a letter sent from the U.S. Attorney's Office's Financial Litigation Unit to Harley regarding a past-due balance on a judgment payment, was briefly displayed to the jury.[9] *Testimony of Karen Muslowski*, App. 824A. That document reflected a "criminal" docket number for the monetary judgment that Ms. Muslowski was testifying about. No objection was lodged at the time the document was displayed, nor has there ever been any indication that

---

[9]    The redacted version of the document has been included in the Appendix at App. 2031A. The un-redacted document can be located at exhibit 1 to the Response of the United States to Harley's post-trial Motion for Acquittal, Rec. Doc. No. 202. As will be discussed, the only redaction was the "whiting out" of a line below "Re: U.S.A. v. Harley" which read "Criminal No. 3:CR96-286-1."

that anyone on the jury even noticed the word "criminal." Indeed, no objection was made to the inclusion of any aspect of this document prior to trial when all of the government's exhibits were turned over to the defense for review.

Nonetheless, the next day, Harley raised the matter (albeit incorrectly stating it had occurred during the testimony of Greg Schiller.) App. 997A. Although the Court stated it did not remember seeing the reference, the Court did indicate it would give a curative instruction if the defense wanted it to do so. App. 998A. The matter was then put on hold so the government could find the document Harley was referring to. App. 1001A.

Over the lunch break, the government identified the document as Gov't Ex. 20.6(E). App. 1040A. All agreed that the caption used the word "criminal" and that it had been displayed for the jury. *Id.* That being said, there was no other information on the document indicating the nature of the charge or any other specifics and the parties agreed to redact that portion of the document before it was again provided to the jury. *Id.* Once again the district court stated it was willing to provide a curative instruction if Harley wished. App. 1040A-1041A. No request

for a mistrial was made, rather Harley only requested time to think over whether he wanted such an instruction. App. 1041A. Notably, it was made clear to Harley by his own defense counsel that the failure to request such an instruction would function as a waiver of the issue on appeal. *Id*.

As Harley concedes in his brief at p. 22, on December 15, 2014, he declined to request a curative instruction regarding the inadvertent display of the criminal docket number. App. 1407A.

The United States submits that, by failing to request a curative instruction, Harley has waived any argument that the district court erred in failing to deliver one, and any such argument is subject to plain error review. Moreover, the facts of the case do not support a claim that the inadvertent display of the criminal docket number was so prejudicial that a miscarriage of justice would result if a new trial was not granted. First, there is no evidence that anyone on the jury even noticed the word "criminal" during the few moments the document was displayed, or interpreted it to mean that Harley was previously convicted of an offense. Second, Harley's own decisions to forego seeking a mistrial and decline a curative instruction support the idea

that it's momentary display was insignificant in the light of a nearly two-week long trial where overwhelming evidence of Harley's guilt was introduced.

Harley's sole reliance on *United States v. Rinaldi*, 301 F.2d 576 (2d Cir. 1962) in support of his demand for a new trial is misplaced. In *Rinaldi*, a motion for a mistrial was made because the prosecutor deliberately asked the defendant's wife if her husband was ever convicted of a crime and the witness answered "yes". *Rinaldi*, 301 F.2d at 577. An immediate motion for a mistrial was made and denied by the court, but ultimately the Second Circuit reversed.

Unlike <u>Rinaldi</u>, there was no testimony here about a prior criminal conviction, there is no indication that the evidence was intentionally elicited, and there was no request for a curative instruction – let alone a motion for a mistrial.

In *United States v. Tomlinson*, 2 Fed. App'x 104 (2d Cir. 2001) (not precedential), the Second Circuit further elaborated on the *Rinaldi* standard and found that a new trial was not warranted under far worse facts than presented here. In *Tomlinson*, a witness referred to the defendant's "extensive criminal history." *Id.* at 105. In determining

55

that this statement did not support the granting of a new trial, the
Second Circuit noted that no contemporaneous objection to the witness's
testimony was raised and there was no request for a curative
instruction. *Id.* Moreover, the court noted that the district court's *sua*
*sponte* invitation for a curative instruction was declined. Given those
facts, the court found that the testimony did not seriously affect the
fairness, integrity, or public reputation of judicial proceedings. *Id.*

Notably, this Court has also held that inadvertent disclosures far
worse than the one at issue here were harmless. *See, e.g.*, *United States*
*v. Self*, 681 F.3d 190, 199 (3d Cir. 2012) (Testimony that defendant was
"already in jail" held harmless, noting that the comment was "brief,
isolated, and unsolicited."); *United States v. Greenstein*, 322 Fed. App'x
259, 264 (3d Cir. 2009) (Use of the terms "police photo" by prosecutor
and "weapons violation" by witness held harmless).

In light of the specific facts of this case and the cases discussed
above, Harley cannot show that he was so prejudiced by the brief,
inadvertent display of a criminal docket number, that he is entitled to a
new trial. His claim to the contrary should, therefore, be rejected.

III.    Whether the district court erred in denying Harley's motion to suppress evidence discovered during the search of his home, when a valid warrant had been issued for the search.

As his next argument on appeal, Harley asserts that the district court erred when it refused to suppress evidence found during the August, 29, 2012 search of his home.[10] *Harley Br*. at 23-24. The basis for that motion to suppress was Harley's claim that he was neither shown nor given a signed and dated search warrant on that date. *Memorandum in Support of Defendant's Motion to Suppress*, Rec. Doc. No. 41. The district court conducted a suppression hearing where the primary issue ended up being whether or not a signed and dated warrant had been shown to Harley on August 29, 2012. *See Transcript of April 8, 2014, Suppression Hearing*, App. 1565A-1608A.

During this hearing, the United States entered into evidence, without objection from the defense, a signed and dated search warrant for Harley's home issued by the magistrate judge two days before the search – on August 27, 2012. *See Exhibit 1 to the Reply of the United*

---

[10]    Somewhat inexplicably, Harley identifies the date of the search as "February 29, 2012" at page 23 of his brief. This is assumed to be simple error on opposing counsel's part as throughout the case there has been no dispute that the search occurred on August 29, 2012. *See Transcript of Suppression Hearing*, App. 1569A, 1587A.

*States to Defendant's Motion to Suppress*, Rec. Doc. No. 42; *Transcript of Suppression Hearing*, App. 1577A. While Harley's counsel stated at the hearing that "there's some question" as to whether the warrant was actually issued on August 27, 2012, Harley has never offered any evidence to prove that the warrant was not issued on that date, nor has he responded to the government's observation that the district court could take judicial notice of the fact the warrant was assigned a case number and filed by the magistrate judge's office on August 27, 2012. App. 1606A.

Ultimately the district court denied Harley's suppression motion. *Order*, App. 23A. In doing so the district court did not resolve the factual dispute as to whether or not a signed and dated copy of the warrant was shown or given to Harley on August 29, 2012, instead holding that the government had demonstrated that a valid warrant had been issued, and any failure to provide a copy to Harley was, at most, a technical violation of Fed. R. Crim. P. 41 that did not require suppression. App. 26A-27A.

In challenging this decision, Harley raises two arguments: (1) the district court did not make any findings as to prejudice to Harley or bad

faith on the part of law enforcement; and (2) the district court did not make any findings as to the factors set forth in the case of *United States v. Jackson*, 617 F.Supp.2d 316 (M.D.Pa. 2008). *Harley Br*. at 23-24.

As to the first argument, the reason the district court may not have felt the need to explicitly mention a lack of prejudice to Harley even if he was not shown/given a signed and dated copy of the search warrant is because Harley has never articulated – either in the district court or in his brief before this Court – any prejudice flowing from that alleged failure. A district court can hardly be faulted for failing to rule on an issue that isn't raised.

As to potential bad faith on the part of law enforcement, to the extent this was raised below it was only in arguing that if law enforcement relies on a facially deficient warrant, it can constitute "bad faith." *Memorandum in Support of Defendant's Motion to Suppress*, Rec. Doc. No. 41, at 3-4. As the district court noted, however, *the federal agents had procured a valid warrant at the time of the search*. Even if those agents didn't show Harley a copy of it, it does not change the fact that they possessed it. As Harley himself conceded in briefing his motion to suppress, a search conducted pursuant to a warrant typically

suffices to prove that an officer conducted a search in good faith. *See* Rec. Doc. No. 41 at 4 (citing *United States v. $92,422.57*, 307 F.3d 137, 146 (3d Cir. 2007)).[11] As such, Harley's argument that the district court erred in failing to examine the existence of prejudice or bad faith in connection with the August 29, 2012, search must fail. *See United States v. Lipford*, 203 F.3d 259, 270 (4th Cir. 2000) ("presuming that [defendant] is correct that some copies of the warrant were signed but that his was not, this was, at most a technical violation of Federal Rule of Criminal Procedure 41(d), and not a violation of the Fourth Amendment"); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. 1981) ("Violations of Rule 41(d) are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad-faith").

Harley's second argument regarding the "*Jackson* Factors" similarly misses the mark. In *Jackson*, the district court was tasked

---

[11] Harley has never alleged, nor is there evidence establishing, that one of the four typical bases for not allowing the reliance on a warrant exist, i.e. reliance on a false affidavit, lack of a neutral magistrate, an affidavit unreasonably lacking in probable cause, or lack of particularity. See *United States v. $92,422.57*, 307 F.3d at 146.

with determining whether an unsigned warrant was still issued after a finding of probable cause such that the requirements of the Fourth Amendment were satisfied. *See Jackson*, 617 F.Supp.2d. at 320-21. In analyzing the facts of that case, the district court relied upon a variety of factors that other courts had previously used in such an analysis. *Id.* That the district court in Harley's case did not go through these factors in detail is hardly surprising since, as noted above and as cannot seriously be contested, *the federal agents had procured a valid, signed and dated warrant at the time of the search.* As the Jackson court noted, "[g]enerally, an issuing authority's finding of probable cause is conveyed via his or her signature on the warrant" and the other factors only become necessary if a signature does not exist. *Id.*

Given that the district court concluded that a valid search warrant was issued in this case, regardless of whether it was actually shown to Harley at the time his home was searched, it was not an error to forego any "*Jackson* factor" analysis and Harley's claim to the contrary should be rejected.

61

IV.   The district court did not err in denying Harley's motion to
dismiss the indictment when he claimed that the United States
offered perjured testimony in the grand jury proceedings that
was allegedly "inconsistent" with evidence introduced at trial.

As his final argument on appeal, Harley insists that this Court
must overturn his convictions on counts one through ten based on his
claim that the United States offered perjured testimony in the grand
jury proceedings. *Harley Br*. at 25-26. Specifically he alleges that the
United States presented the false testimony of two Enpetro employees
in the grand jury who stated they had not sent Harley an original
promissory note regarding oil assets in Texas. *Id*. at 25. Harley posits
that the United States *may* have been aware this was false testimony
given that an FBI report recorded that one of these witnesses said in an
interview that he had sent the note to Harley, and at trial an FBI
special agent testified that he found multiple "original" promissory
notes from Enpetro in Harley's home. *Id*. at 25-26. In conclusory
fashion, Harley asserts this influenced the grand jury's decision to
indict, and also explains that the evidence of his possession of "original"
Enpetro promissory notes was a key aspect of his defense at trial. *Id*. at
26.

As an initial matter, it is far from clear that the Enpetro employees perjured themselves during the grand jury proceedings. As the Supreme Court has explained, "[a] witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Both of the Enpetro employees Harley accuses of perjury (Alvin Dedmond and William Tranthan) testified before the grand jury in February of 2012. *See Motion to Dismiss Indictment*, Rec. Doc. No. 218, Exh. A and C. The FBI Report Harley relies upon in "proving" perjury was compiled after an interview in 2000 – twelve years prior. To the extent that there are any inconsistencies between the testimony and the FBI report, there is no evidence, and Harley offers none, that these inconsistencies were the result of a willful intent to provide false testimony as opposed to confusion, mistake or faulty memory a dozen years after the fact. Notably, Harley elected not to call either Enpetro employee at trial to explore their supposed inconsistencies.

As to the FBI's discovery of "original" promissory notes during the August 29, 2012 search of Harley's home, in making his argument Harley has subtly – but importantly – altered the nature of FBI Special Agent Browning's testimony. Special Agent Browning testified at trial that he and his team discovered "original looking" promissory notes. *Testimony of Special Agent Browning*, App. 1167A. This is not a distinction without a difference. Special Agent Browning was not capable of determining if a promissory note was original or not, particularly in light of the evidence (previously discussed in above argument sections) that Harley had been actively engaged in generating fraudulent documents. Moreover, even if the promissory notes were originals, Harley's possession of them still does nothing to demonstrate that the Enpetro employees' grand jury testimony was willfully intended to provide false testimony as opposed to resulting from confusion, mistake or faulty memory.

Of course even if the Enpetro employee grand jury testimony *did* amount to perjury, Harley's ultimate conviction on all 23 counts he was charged with results in a very high bar for him to clear in getting the

indictment dismissed. As the Supreme Court stated in *United States v. Mechanik*, 475 U.S. 66 (1986):

> [a] petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.* at 70.

The Supreme Court has recognized an exception to the above rule where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988). As the district court observed, however, in rejecting Harley's argument, instances of such "structural errors" are extremely rare and tend to be limited to racial and gender discrimination in the selection of grand jurors. *Memorandum*, App. 54A (citing *United States v. Bingham*, 653 F.3d 983, 998 (9th Cir. 2011)); *see also Bank of Nova Scotia*, 487 U.S. at 257.

Harley argues that, despite the fact he alleges no racial or gender discrimination in the grand jury proceedings, he nonetheless has met the *Bank of Nova Scotia* test for structural error. In doing so he asserts that the key to his Texas Oil scheme defense was his belief that the

promissory notes were legitimate, and thus the alleged perjured Enpetro employee testimony before the grand jury undermined that defense. *Harley Br.* 26-27. He simply cannot show that any prejudice flowed from this alleged perjured testimony, however, let alone any structural error. This is because neither Enpetro employee testified at trial. Not only does this mean that Harley voluntarily gave up the right to question them on their alleged testimonial inconsistencies, but it also means that this supposedly perjured testimony that Harley claims undermined his defense *was never actually presented to the jury*.

In short, Harley's conviction at trial on all counts conclusively demonstrates that, even when the United States declined to present the allegedly problematic testimony, there was not only enough evidence to indict, but enough evidence to convict – and that is sufficient to counter any claim of prejudice flowing from misconduct in the grand jury proceedings. *See United States v. Martino*, 825 F.2d 754, 759 (3d Cir. 1987).

## CONCLUSION

Based upon the preceding arguments, the United States of America respectfully requests that this Honorable Court affirm the district court's denial of Harley's motion to suppress, as well as the conviction and sentence entered by the district court in this case.

BRUCE D. BRANDLER
United States Attorney


STEPHEN R. CERUTTI II
Assistant United States Attorney
Chief, Criminal Appeals
United States Attorney's Office
Middle District of Pennsylvania
Ronald Reagan Federal Building
Suite 220
228 Walnut Street
Harrisburg, Pennsylvania  17108
717-221-4482

## CERTIFICATE OF COUNSEL

I, Stephen R. Cerutti, certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

/s/ Stephen R. Cerutti II
STEPHEN R. CERUTTI II
Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief consists of 13,186 words and does not exceed the 14,000 word limit.

/s/ Stephen R. Cerutti II
STEPHEN R. CERUTTI II
Assistant U.S. Attorney

## IDENTICAL PDF & HARD COPY CERTIFICATE

The undersigned hereby certifies that the PDF file and Hard Copies of this brief are identical.

/s/ Stephen R. Cerutti II
STEPHEN R. CERUTTI II
Assistant U.S. Attorney

## VIRUS SCAN CERTIFICATE

This e-mail and the attached brief has been automatically scanned during preparation and upon sending by the following virus detection programs: OfficeProtect/Inoculan, ScanMail, and Viruswall, and no viruses were detected.

/s/ Stephen R. Cerutti II
STEPHEN R. CERUTTI II
Assistant U.S. Attorney

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | No.  16-1285 |
| | ) | |
| **Appellee** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **RICHARD J. HARLEY** | ) | |
| | ) | |
| **Appellant** | ) | |

## CERTIFICATE OF SERVICE

The undersigned certifies that she has this date, **October 20, 2016,** served two copies of the foregoing

## BRIEF OF APPELLE

by first class mail postage prepaid as follows:


Joseph A. O'Brien, Esquire
OLIVER, PRICE & RHODES
1212 South Abington Road
Clarks Summit, PA 18411
jaob@oprlaw.com


/s/ Cindy J. Long
CINDY J. LONG
Legal Assistant